**In the Matter of an Application for a Certificate of Need for Construction of an INDEPENDENT SPENT FUEL STORAGE INSTALLATION.**

**Nos. C1–92–2314, C3–92–2315 and C9–92–2321.**

Court of Appeals of Minnesota.

June 8, 1993.

Review Denied July 15, 1993.

Hubert H. Humphrey, III, Atty. Gen., Margie E. Hendriksen, Sp. Asst. Atty. Gen., Katherine L. McGill, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Public Utilities Com'n.

Michael J. Bradley, Michael J. Ahern, Moss & Barnett, and Michael C. Connelly, Northern States Power Co., Minneapolis, for respondent Northern States Power Co.

Paul Zerby, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Dept. of Health.

Alan R. Mitchell, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Environmental Quality Bd.

Eric F. Swanson, Sp. Asst. Atty. Gen., St. Paul, for respondent Minnesota Dept. of Public Service.

Eila E. Savela, Minneapolis, for relator Minnesota Public Interest Research Group.

Brian B. O'Neill, Richard A. Duncan, Michael A. Ponto, Faegre & Benson, Minneapolis, and Kurt V. Bluedog, William J. Hardacker, Bluedog Law Office, Bloomington, for relator Prairie Island Mdewakanton Dakota Community.

Kenneth Tilsen, Public Interest Project of Hamline University School of Law, G.P.C., St. Paul, for relator Prairie Island Coalition Against Nuclear Storage.

James Schoessler, Jacobson, Buffalo, Schoessler, & Magnuson, Minneapolis, for amicus curiae Prairie Island Religious Task Force.

John Grzybek, St. Paul, and Mark S. Wernick, Minneapolis, for amicus curiae Certain Individual Members of the Minnesota House of Representatives and the Minnesota Senate.

Considered and decided by ANDERSON, C.J., and CRIPPEN and AMUNDSON, JJ.

## OPINION

AMUNDSON, Judge.

Relators appeal the order of the Minnesota Public Utilities Commission (the commission) granting respondent Northern States Power Company (NSP) a certificate of need to build a radioactive waste storage facility at its Prairie Island nuclear generating plant. The commission rejected the administrative law judge's recommendation that the petition be denied. Relators contend the commission's order is unsupported by substantial evidence, arbitrary and capricious, and affected by other errors of law. We affirm in part, reverse in part, and remand.

## FACTS

NSP operates a nuclear power plant at Prairie Island, near Red Wing. Prairie Island has two nuclear reactor units. After NSP removes spent fuel assemblies from its units, it stores them in on-site spent fuel pools. The spent fuel must be stored until the United States Department of Energy (DOE), pursuant to federal law and a contract with NSP, removes the spent fuel to a monitored retrieval storage installation (MRS)[1] or a geologic repository.[2]

---

1. Federal law defines an MRS installation as:

   [A] complex designed, constructed, and operated by DOE for the receipt, transfer, handling, packaging, possession, safe-guarding, and storage of spent nuclear fuel aged for at least one year and solidified high-level radioactive waste resulting from civilian nuclear activities, pending shipment to a [high-level radioactive waste] repository or other disposal.

   10 C.F.R. § 72.3 (1992).

2. A geologic repository is:

   [A] system which is intended to be used for, or may be used for, the disposal of radioactive wastes in excavated geologic media. A geologic repository includes: (1) The geologic

The federal government is trying to find a site for an MRS and to develop Yucca Mountain, Nevada as a geologic repository. Before either the MRS or the geologic repository is built, the Prairie Island power plant will need more storage capacity. To meet this need, NSP wants to build a dry cask independent spent fuel storage facility installation (proposed facility). Dry cask storage uses helium to cool spent fuel instead of water; NSP's existing spent fuel pools use water.

The first component of the proposed facility is the cask—a large, heavy, fully-sealed metal canister equipped with an internal basket for holding spent fuel assemblies. The cask is approximately 17 feet tall by 9 feet wide, and it weighs 120 tons when fully loaded. Each cask holds up to 40 spent fuel assemblies. The second component is the Independent Spent Fuel Storage Installation. The functional part of the storage installation consists of two large concrete pads upon which the casks would be placed. Each pad would be capable of holding up to 24 casks. The pads would be located approximately 1500 feet northwest of the reactor buildings and would be surrounded by a security fence.

Construction of the proposed facility would not replace the need for pool storage. The pools would continue to provide storage for recently discharged spent fuel. The proposed facility would be used for spent fuel that has cooled for 10 years or more in the pools.

To site or construct a "large energy facility," NSP must obtain a certificate of need from the commission. *See* Minn.Stat. § 216B.243, subd. 2 (1990). A large energy facility includes "any nuclear fuel processing or nuclear waste storage or disposal facility." Minn.Stat. § 216B.2421, subd. 2(g) (1990). Prior to 1977,[3] the definition of "large energy facility" did not explicitly include a nuclear waste storage facility.[4] Minn.Stat. § 116H.02, subd. 5 (1976). The definition of "large energy facility" was amended in 1977 to include "[a]ny nuclear fuel processing or nuclear waste storage or disposal facility." *See* 1977 Minn.Laws ch. 381, § 8.

NSP applied for a certificate of need for the proposed facility pursuant to Minn.Stat. § 216B.243 (1990). It requested authority to use up to 48 storage casks, which would provide storage for Prairie Island until its Nuclear Regulatory Commission license expires in 2014. The certificate of need application was referred to the Office of Administrative Hearings for a contested case hearing.

After 18 days of evidentiary hearings and 3 days of public hearings, the administrative law judge (the ALJ) recommended that the commission deny the certificate of need. The ALJ found that storage at the proposed storage facility would, in fact,

---

repository operations area, and (2) the portion of the geologic setting that provides isolation of the radioactive waste.
10 C.F.R. § 60.2 (1992).

**3.** At that time, the grant of a certificate of need was the responsibility of the Minnesota Energy Agency pursuant to chapter 116H. *See* Minn. Stat. § 116H.07, subd. 1(f) (1976).

**4.** Minn.Stat. § 116H.02, subd. 5 (1976) defined a "large energy facility" as

any electric power generating plant or combination of plants at a single site with a combined capacity of 50,000 kilowatts or more, any high voltage transmission line with a capacity of 200 kilovolts or more and having more than 100 miles of its length in Minnesota, any facility on a single site designed for or capable of storing more than one million gallons of crude petroleum or petroleum fuels or oil or derivatives thereof, any pipeline greater than six inches in diameter and having more than 50 miles of its length in Minnesota used for the transportation of crude petroleum or petroleum fuels or oil or derivatives thereof, any pipeline for transporting natural or synthetic gas at pressures in excess of 200 pounds per square inch and having more than 50 miles of its length in Minnesota, any facility designed for or capable of storing on a single site more than 100,000 gallons of liquified natural or synthetic gas, any underground gas storage facility requiring a permit pursuant to section 84.57, any facility designed or capable of serving as a depot for coal transported into this state for use within the state or transshipment from the state and any petroleum refinery, and any facility intended to convert coal into any other combustible fuel and having the capacity to process in excess of 25 tons per hour.

become permanent.[5] The ALJ stated "In all likelihood, the DOE will not take spent fuel away from Prairie Island in the predictable future." The ALJ concluded that since storage would be permanent, Minn. Stat. §§ 116C.71, subd. 7, and 116C.72 of the Radioactive Waste Management Act (the Act) require legislative authorization for the proposed facility.

Relators moved to strike NSP's certificate of need application for a temporary storage facility. Relators requested the commission to require a supplemental environmental impact statement because of the ALJ's finding that the storage facility would be permanent rather than temporary.

The commission rejected the ALJ's recommendation, concluding that nuclear waste storage at the facility would not become permanent. It stated:

> To assume that the federal government will not fulfill its longstanding obligation to dispose of high level nuclear waste would violate established principles of intergovernmental comity, principles the Commission has always honored. The Commission sees no reason to refuse to honor those principles in this case. While the technical and political obstacles the Department of Energy faces are real, they are not insurmountable. The Department has shown no intention of abandoning its nuclear waste management responsibilities. The Commission has therefore based its analysis of environmental effects and its cost calculations and comparisons on the assumption that the Department of Energy will begin to remove the stored waste within a time frame reasonably close to the one enunciated by that agency.

The commission also concluded the Act does not require legislative authorization for the proposal since the facility comes within the Act's "point of generation" exception. The commission issued an order granting a certificate of need for the facility, authorizing the use of 17 storage casks.

The commission denied petitions for reconsideration and issued its final order. The Prairie Island Mdewakanton Dakota Community (the Community), the Minnesota Public Interest Research Group (MPIRG), and the Prairie Island Coalition Against Nuclear Storage filed petitions for writ of certiorari. In addition to these relators, this court has granted amicus status to the Prairie Island Religious Task Force and certain members of the Minnesota House of Representatives and Senate.

## ISSUES

1. Does Minn.Stat. § 116C.72 (1986) require NSP to obtain legislative authorization for the proposed storage facility?

2. Did the commission err by determining that the proposed storage facility is necessary and in the public interest under Minn.Stat. § 216B.243 (1990)?

3. Did the commission err by determining that a supplemental environmental impact statement that addresses permanent or indefinite storage is not necessary before the commission may issue a certificate of need for the proposed storage facility?

4. Did the commission err by determining the proposed storage facility would not violate Minn.Stat. § 116B.09, subd. 2 (1990) of the Minnesota Environmental Rights Act and Minn.Stat. § 116D.04, subd. 6 (1990) of the Minnesota Environmental Policy Act?

## ANALYSIS

■ Judicial review of an agency decision in a contested case is governed by Minn.Stat. § 14.63–.69 (1992). We may reverse the agency's decision if we find it is unsupported by substantial evidence, arbitrary or capricious, or affected by other error of law. Minn.Stat. § 14.69. Although agency decisions are presumed correct and are typically accorded deference by the judiciary, deference does not extend to an agency's interpretation of a statute. *In re Petition of Fritz Trucking, Inc.*, 407

---

**5.** The ALJ cited the Webster's Ninth New Collegiate Dictionary 876 (1988) definition of "permanent": "continuing or enduring without fundamental or marked change: stable, * * * lasting."

N.W.2d 447, 450 (Minn.App.1987), *pet. for rev. denied* (Minn. July 31, 1987). Statutory interpretation is the domain of the judiciary. *Id.*

## I. Legislative Authorization

Relators argue that NSP must obtain legislative authorization before the commission can grant a certificate of need for the proposed facility.

The Minnesota legislature limited the commission's authority to issue certificates of need for nuclear waste storage or disposal facilities when it passed the Radioactive Waste Management Act. The Act provides:

> Notwithstanding any provision of chapter 116H, to the contrary, no person shall construct or operate a *radioactive waste management facility* within Minnesota unless expressly authorized by the Minnesota legislature.

Minn.Stat. § 116C.72 (1986) (emphasis added). The Act defines "radioactive waste management facility" as

> a geographic site, including buildings, structures, and equipment in or upon which radioactive waste is retrievably or irretrievably disposed by burial in soil or permanently stored.

Minn.Stat. § 116C.71, subd. 7 (1990). Later, the legislature amended the Act and defined "dispose" or "disposal" as

> the permanent or temporary placement of high level radioactive waste at a site within the state other than the point of generation.

*Id.*, subd. 16 (1990).

We must decide whether the proposed storage facility is a radioactive waste management facility within the meaning of the Act. In deciding this issue, we focus on (1) whether the proposed storage facility comes within the Act's "point of generation" exception; (2) whether the legislature intended the Act to apply to nuclear waste generated in Minnesota; and (3) the meaning of the term "permanently stored."

## A. "Point of Generation" Exception

■ The commission concluded NSP need not obtain legislative authorization for the proposed facility because it falls within the Act's "point of generation" exception.

The Act requires legislative authorization only for "radioactive waste management facilities." Minn.Stat. § 116C.72. The Act defines "radioactive waste management facility" as a site upon which radioactive waste is "retrievably or irretrievably *disposed* by burial in soil or permanently stored." Minn.Stat. § 116C.71, subd. 7 (emphasis added). Waste stored at a "point of generation" is excluded from the definition of "disposed." *Id.*, subd. 16.

The commission and NSP argue that the word "disposed" in subdivision 7 modifies "by burial in soil or permanently stored." Thus, they argue, there are two ways waste may be "disposed": (1) "by burial in soil," and (2) by being "permanently stored." Since the point of generation exception applies to waste that is "disposed," and they contend that both burial in soil and permanent storage are types of disposal, the commission and NSP urge us to conclude that any waste at a point of generation, whether buried in soil or permanently stored, is not covered by the Act.

Relators, however, argue that the word "disposed" only modifies "by burial in soil." They claim that the word "or" in the phrase "disposed by burial in soil or permanently stored" is disjunctive—separating the two terms. Relators contend that the commission's construction results in a grammatically incorrect reading of the statute—that it is incorrect to say waste is "disposed by * * * permanently stored." They further contend that, had the legislature intended the point of generation exception to apply to permanent storage, the statute would read "disposed by * * * permanent storage." Thus, relators conclude that NSP does not need legislative authorization for waste buried in soil at the point of generation, but that it must still obtain legislative authorization for waste that is "permanently stored" at a point of generation.

We agree that the word "or" in the definition of "disposed" is disjunctive and separates the two terms. Thus, "disposed" only modifies "by burial in soil." To read the statute otherwise would be grammatically incorrect. *See* Minn.Stat. § 645.08(1) (1992) (words and phrases are construed according to rules of grammar). This construction does not, however, make the "point of generation" exception irrelevant, as the commission argues. The phrase "point of generation" still applies to a facility in which waste is disposed "by burial in soil" and therefore the exception remains effective. *See* Minn.Stat. § 645.16 (1992) (laws shall be construed to give effect to all provisions). While no Minnesota facility apparently uses this method today, the provision is not rendered meaningless because the legislature was aware at the time of the statute's enactment that disposal by burial was a method of storage.[6]

### B. Non–Minnesota and Minnesota Generated Waste

The commission argues legislative authorization is not necessary in this case because the Act only applies to a federal nuclear waste repository sited in Minnesota or the transportation of nuclear waste into the state. Sections 116C.72 and 116C.71, subdivision 7, however, do not distinguish between Minnesota and non-Minnesota generated waste or between state and federal facilities. Earlier versions of the bill made a distinction between "Minnesota Radioactive Waste" and "Non–Minnesota Radioactive Waste." *See* H.F. 1215 (1977), S.F. 1133 (1977). This distinction was ultimately abandoned. *See* Minn.Stat. §§ 116C.72, 116C.71, subd. 7. We will not disregard the clear language of the law in pursuit of its alleged spirit. *London Constr. Co. v.*

*Roseville Townhomes, Inc.*, 473 N.W.2d 917, 919 (Minn.App.1991). Therefore, whether the waste is generated in Minnesota or not is immaterial, and sections 116C.72 and 116C.71, subdivision 7 apply to both Minnesota and non-Minnesota generated waste transported into the state.

Our conclusion is buttressed by the fact that the legislature has expressly dealt with non-Minnesota generated waste transported into the state. Minn.Stat. § 116C.73 (1986) provides:

> Notwithstanding any provision of chapter 116J, to the contrary, no person shall transport radioactive wastes into the state of Minnesota for the purpose of disposal by burial in soil or permanent storage within Minnesota unless expressly authorized by the Minnesota legislature, except that radioactive wastes may be transported into the state for temporary storage in accordance with applicable federal and state law for up to 12 months pending transportation out of the state.

In view of the legislature's expressed concern with non-Minnesota waste in section 116C.73, it is unreasonable to presume the legislature intended the broader language in sections 116C.72 and 116C.71, subdivision 7 to be restricted to non-Minnesota waste transported into the state. *See* Minn.Stat. § 645.16.

### C. Permanently Stored

"Disposal" is not a concern in this case since NSP's proposed facility does not involve burial in soil. Thus, in deciding whether the proposed facility is a radioactive waste management facility, we must determine whether it is a site where waste is to be "permanently stored." If it is, the

---

**6.** Jack Furman of the Minnesota Pollution Control Agency testified at the Senate hearing that:

> The spent fuel wastes are not the only wastes—there is another category of waste, that while radioactive, [is] much less lethal. These other wastes derive from all the other steps in the uranium fuel cycle. However, the dominant wastes in this category originate in reactors—these basically come from the reactor coolant cleanup systems * * *. This kind of waste [is] placed in barrels and they are buried in trenches in soil.

*Hearing on S.F. No. 1133 Before the Senate Committee on Agriculture and Natural Resources* (Apr. 22, 1977) (statement of Jack Furman). At the House hearing, Furman stated:

> There are two categories of waste disposal which are licensable by the United States government. One is the type of facility which is called a burial ground.

*Hearing on H.F. No. 1215 Before the House Committee on Environment and Natural Resources* (May 2, 1977) (statement of Jack Furman).

proposed facility is a radioactive waste management facility within the meaning of the Act, and NSP must obtain legislative authorization. If it is not, legislative authorization is not necessary.

■ The object of all statutory construction is to ascertain and effectuate the intent of the legislature. Minn.Stat. § 645.16. The Act does not define the term "permanently stored." The commission did not define the term either.

■ The term could, as NSP argues, refer only to facilities such as Yucca Mountain, which are designed to store waste for 10,000 years or more. The term "permanently stored" could also refer, as the Community contends, to any facility in which waste will be stored longer than 25 years. We conclude the term is ambiguous. *See Tuma v. Commissioner of Economic Sec.*, 386 N.W.2d 702, 706 (Minn.1986) ("A statute is ambiguous when it can be given more than one reasonable interpretation."). When the terms in a statute are ambiguous, we may consider, among other things, the occasion and necessity for the law, the circumstances under which it was enacted, the object to be attained, the consequences of a particular interpretation, and the contemporaneous legislative history. Minn. Stat. § 645.16.

■ The proper inquiry in this case is to ask whether the proposed storage facility is properly classified as a site where waste is permanently stored. It is important to keep in mind that the focus is on the classification of the facility—is NSP's proposed facility a radioactive waste management *facility?* Thus, rather than trying to de-

cide whether in fact the waste will remain at NSP's proposed facility for 10, 20, or 50 years or more, or whether "the federal government will not fulfill its longstanding obligation to dispose of high level nuclear waste," we focus on classification of the facility itself.

Permanent storage facilities no doubt include geologic repositories like the one planned for Yucca Mountain. But the Act is not limited to such a facility. We observed earlier that sections 116C.72 and 116C.71, subdivision 7, especially as contrasted with language in section 116C.73, deal with locally generated waste. The sections are not confined to the siting of repositories for collecting waste from throughout the nation. Moreover, the plain language of the Act indicates the legislature wished to retain authority over waste that is either "retrievably or irretrievably stored." *See* Minn.Stat. § 116C.71, subd. 7.[7]

Our review of the legislative history shows the legislature anticipated facilities such as NSP's proposed facility would be covered by the Act. *See* Minn.Stat. § 645.16(7) (legislative intent may be ascertained by considering contemporaneous legislative history). Jack Furman, appearing on behalf of the Minnesota Pollution Control Agency, indicated in his testimony before the House Committee on Environment and Natural Resources, as well as before the Senate Committee on Agriculture and Natural Resources, that one of the objects the legislature wished to attain with the bill was *to retain authority over above-ground storage of radioactive waste in metal canisters.*[8] *See* Minn.Stat. § 645.16(4) (legisla-

7. This language was used in the enactment to describe facilities where waste is disposed of by burial. These facilities, along with others providing permanent storage, require legislative approval. Although the clause on retrievable facilities was not repeated as a modifier to "permanently stored," the reference to retrievable facilities refutes unequivocally any argument that the 1977 legislature intended to deal only with irretrievable depositories.

8. At the Senate hearing, Furman testified:
We do not know exactly what plans the government has for storing spent fuel rods. From what we have been able to learn we

imagine that they will install them in long steel stainless steel canisters [inaudible] approximately 15 feet long by a couple of feet in diameter [inaudible] fuel elements. These we presume will be arranged in some sort of a *rack arrangement to hold them up* [inaudible] stand up without falling over and I do imagine these will either be placed underground or will be placed in a surface structure—a heavily reinforced steel building, for example. *Hearing on S.F. No. 1133 Before the Senate Committee on Agriculture and Natural Resources* (Apr. 19, 1977) (statement of Jack Furman). At the House hearing, he testified:

tive intent may be ascertained by considering the object to be attained). From this, we conclude that the legislature did not intend to retain its authority only over facilities like Yucca Mountain—facilities in which the waste is stored in caverns. Instead, Furman's testimony shows that the legislature was aware of other facilities—facilities in which waste is stored in canisters placed above ground. These facilities, as well as the Yucca Mountain type facilities, were among the mischiefs to be

remedied by retaining control over sites upon which radioactive waste is permanently stored.[9] *See* Minn.Stat. § 645.16(3).

The focus of the discussion at the April 22, 1977 hearing before the Senate Committee on Agriculture and Natural Resources was the length of time NSP needed to keep the waste before it could be safely shipped out of Minnesota.[10] The testimony of Joe Foran of MPIRG supports a conclusion that the legislature anticipated that waste would be shipped to Illinois in the near

> [T]here are two categories of waste disposal which are licensable by the United States government. One is the type of facility which is called a burial ground * * *. Now the second category of waste disposal is what is generally referred to as the high level waste repository. *This is the sort of thing that this bill most practically addresses,* that is, the thing that is buried deep underground in caverns, or, if President Carter's new energy proposal proceeds as we expect, it'll amount to surface buildings in which radioactive material will be stored in. That type of facility as repository would be under federal ownership and federal control and could not, I don't suppose, be put on, sited on, state owned land, but would have to be on federal[ly] owned land.

*Hearing on H.F. No. 1215 Before the House Committee on Environment and Natural Resources* (May 2, 1977) (statement of Jack Furman) (emphasis added).

**9.** In coming to this conclusion, we decline to impose an overly stringent standard in trying to discern what sort of facility the legislature had in mind. First, the statute does not explicitly indicate exactly what type of storage facility or technology is covered. Second, Furman's testimony at the April 19, 1977 Senate Hearing indicates that the legislature did not have a very clear idea of even what a federal storage facility would be like. He stated that "We do not know exactly what plans the government has for storing spent fuel rods. From what we have been able to learn we imagine that they will [store the waste in steel canisters either above or below ground.]" *Hearing on S.F. No. 1133 Before the Senate Committee on Agriculture and Natural Resources* (Apr. 19, 1977) (statement of Jack Furman). Third, we must recognize the nature of the technology involved. The proposed dry cask facility uses a cask design that has not yet been approved by the NRC when the final environmental impact statement was prepared. Final Environmental Impact Statement—Prairie Island Independent Spent Fuel Storage Installation at 3.7 (Apr. 12, 1991) ("The TN–40 [cask manufactured by Transnuclear, Inc.] was designed specifically for NSP's Prairie Island plant, and has not yet been approved by the NRC."). To require that the 1977 legislature

have contemplated a specific design that still lacked NRC approval in 1991 as a prerequisite to applying the 1977 statutory enactment in 1993 is unreasonable and unrealistic.

**10.** This is illustrated by the following exchange between Senator Gerald Willet, chair of the committee, and Arthur Renquist of NSP:

> Renquist: At this time, the bill required that wastes be shipped outside of Minnesota within 12 months.
> Willet: I guess I don't care about that, I guess I want to know about the plants' capabilities of storage and what the normal period of time before you ship the waste—that's what I want to know. You've been shipping waste evidently. What's the normal period of storage time before you ship?
> Renquist: It varies greatly from the type of waste. Some you will store for a month, others you will store for many years.
> Willet: Well, many is many, many is three.
> Renquist: If you would like a number I would have to say like eight—up in that range—because there is some waste that I am going to talk about later, you do not want to handle any sooner than you have to. You're just maximizing the exposure of employees.
> Willet: We understand that—it's too hot yet and if you get an accident on transport you got a problem. The reason I ask you the question, if eight years is a sensible figure then we ought to talk about that. If five years is sensible, we ought to talk about that. We got two plants, Prairie Island and Monticello, this committee wants to know the maximum amount of time necessary before that material can be shipped, so you're not exposing the general public on the route you ship on to unnecessary hazards. If eight years is the time, let's talk about that. This committee is open for any kinds of discussions that meets the public needs.

*Hearing on S.F. No. 1133 Before the Senate Committee on Agriculture and Natural Resources* (Apr. 22, 1977).

future.[11] Gerard Goering, superintendent of operations for NSP, also indicated that there was space available in Illinois, but that the Morris facility was held up in licensing proceedings.[12] Goering testified that some decay time was needed before shipment.[13] In this discussion, various lengths of time were suggested which would enable NSP to ship the waste out of Minnesota safely. Time frames ranging from one to eight years were mentioned. Although the bill as finally enacted has no specific time frame, it is unreasonable to conclude that the legislature, after having discussed figures ranging from one to eight years, anticipated that waste would be stored for a much longer time period. This leads us to conclude that the legislature assumed that radioactive waste at Prairie Island would stay in the pools for 1, 2, 3, 5, or 8 years—long enough for the waste to cool down so it could be safely shipped to Illinois or some other permanent storage site outside Minnesota.[14] The leg-

11. In response to a question about what would be done with waste generated at Minnesota nuclear power plants, Foran stated:

The State of Illinois has allowed the construction of a nuclear waste disposal facility at Morris—it's operated by the General Electric Company, under a Nuclear Regulatory Commission license. The Northern States Power Company has the opportunity to dispose of a significant amount of the waste from Monticello at that site, because the fuel is General Electric fuel, the disposal site is General Electric also. It's my understanding from talking to the Pollution Control Agency people, that a statement was made yesterday to the effect that General Electric, which in the past has opposed taking fuel from Prairie Island, Prairie Island being a Westinghouse facility, and apparently they no longer do. So all of a sudden Northern States Power has the option of removing that fuel from Prairie Island, at least of portion of it, and I think, as I understand it, I'm not familiar with the exact qualities—quantities, excuse me, but I do know, I think that possibility of storage there is more than adequate. Sandy Gardebring just gave me a note, which says that the bill in any case as presently drafted adequately addresses your concern because it basically says that until a viable alternative is available for storage, waste can be maintained at the two nuclear power generating stations. So in either case, it seems to me that your concern is met.

*Hearing on S.F. No. 1133 Before the Senate Committee on Agriculture and Natural Resources* (Apr. 22, 1977) (statement of Joe Foran).

12. Goering testified:

The Morris facility, as indicated in previous testimony, does have spaces, but they are held up in licensing proceedings that do not allow them to receive fuel at this time.

*Hearing on S.F. No. 1133 Before the Senate Committee on Agriculture and Natural Resources* (Apr. 22, 1977) (statement of Gerard Goering).

13. Goering testified:

Basic plant design was to allow the fission radioactive waste storage to permit a maximum amount of site decay time before shipment. The plant has built into it a safe storage facility for a much longer decay time for the radioactive wastes than 12 months mentioned in the bill. This longer decay time is an inherent safeguard to the public, as opposed to forcing shipment within 12 months when the wastes will be exposed to the relatively more hazardous environment experienced during transportation. If the waste were allowed to decay naturally in the plant storage as designed and reviewed by the Nuclear Regulatory Commission, final shipment would be in a safer mode, because it had decayed. This bill's requirement is in conflict with general industry and NRC philosophy to allow radioactive waste decay in its initial safe storage facility at the plant, so that the hazards of transportation are minimized. We emphasize that the plant is designed to safely store *this material before it is transported.* And the whole philosophy is that you allow it to decay in the plant before you ship it.

*Hearing on S.F. No. 1133 Before the Senate Committee on Agriculture and Natural Resources* (Apr. 22, 1977) (statement of Gerard Goering).

14. This concern was expressed in an earlier version of the bill:

Sec. 2 [MINNESOTA RADIOACTIVE WASTES.] Any radioactive wastes produced within the state of Minnesota shall be disposed of outside the state. Retention of radioactive wastes produced within the state shall be permitted for any period of time necessary for the waste to become safe to transport out of the state or until disposal sites outside of the state become available.

S.F. 1133 (Apr. 6, 1977).

Our conclusion is consistent with the description of the bill by Senator Luther, author of the Senate bill, before the Senate Committee:

[In addition to the bill's transportation provision, the bill provides that] those nuclear wastes products that are produced in the state of Minnesota may remain here on a temporary basis until storage facilities are found in other states or until a permanent storage facility is approved in this state.

*Hearing on S.F. No. 1133 Before the Senate Committee on Agriculture and Natural Resources* (Apr. 22, 1977) (statement of Sen. Luther).

Our conclusion is also supported by the testimony from NSP indicating the need for keeping

islature did not anticipate that Prairie Island's waste would be stored outside the pools in a facility similar to the federal facilities discussed, for a much longer period of time. It is unreasonable to assume that the legislature intended the Act to cover above-ground storage of radioactive waste in steel canisters when the federal government built such a site, but not when such a facility was built by an entity other than the federal government. We find no evidence that the legislature intended that a facility such as NSP's proposed storage facility would escape legislative review.

Our reading of the statute and review of the legislative history lead us to conclude a site upon which radioactive waste is "permanently stored" includes retrievable as well as irretrievable storage facilities, and that the retrievable classification includes a facility whose function is to store waste after it has cooled sufficiently so it can be transported safely. Thus, we conclude the commission erred by not including NSP's proposed facility within the scope of the term "radioactive waste management facility." We hold that NSP's proposed facility must be classified as a radioactive waste management facility, and thus, NSP must obtain legislative authorization pursuant to Minn.Stat. § 116C.72.

## II. *Public Interest*

■ The commission concluded that the consequences to society of granting the certificate of need for the project are more favorable than the consequences of denying the application. Relators contend that NSP failed to show a need for the proposed storage facility.

Under Minn.Stat. § 216B.243, subd. 3 (1990), the commission cannot certify a "proposed large energy facility" unless "the applicant has justified its need." One factor to be taken into account is "possible alternatives for satisfying the energy demand including but not limited to potential for increased efficiency of existing energy generation facilities." *Id.*, subd. 3(7).

The commission examined alternatives at length. This question is inherently a matter requiring expertise in the energy field. *See Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977) (courts should defer to agency's expertise in the field of its training, education, and experience). We hold the commission's determination that the consequences to society of granting the certificate of need are more favorable than the consequences of denying the application is supported by substantial evidence.

## III. *Supplemental Environmental Impact Statement*

The Environmental Impact Statement (EIS) for NSP's proposed facility was premised on the facility being temporary. The Minnesota Environmental Quality Board (EQB) concluded that a supplemental EIS would be required if the commission found the facility would be permanent. The EQB stated:

> [A] conclusion by the [commission] that the proposed storage is actually permanent would require additional environmental review through the preparation of a Supplemental EIS or perhaps a new EIS.

Our interpretation of the term "radioactive waste management facility" is based on our reading of the legislative history and our understanding of legislative intent. We have concluded that NSP's proposed facility is properly classified as one in which waste is permanently stored. Thus, the EQB may have to prepare a supplemental EIS.

## IV. *Minnesota Environmental Law*

The Community argues that the proposed facility will violate section 116B.09, subdivision 2 of the Minnesota Environmental Rights Act, and section 116D.04, subdivision 6 of the Minnesota Environmental Policy Act.

the waste to allow it to decay so it could be shipped safely. *Hearing on S.F. No. 1133 Before the Senate Committee on Agriculture and Natu-* *ral Resources* (Apr. 22, 1977) (statement of Gerard Goering).

The Minnesota Environmental Rights Act provides:

> In any such administrative, licensing, or other similar proceedings, the agency shall consider the alleged impairment, pollution, or destruction of the air, water, land or other natural resources located within the state and no conduct shall be authorized or approved which does, or is likely to have such effect so long as there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare and the state's paramount concern for the protection of its air, water, land, and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not justify such conduct.

Minn.Stat. § 116B.09, subd. 2 (1990). There is identical language in the Minnesota Environmental Policy Act. *See* Minn. Stat. § 116D.04, subd. 6 (1990).

"Pollution, impairment or destruction" is defined as

> any conduct by any person which violates, or is likely to violate, any environmental quality standard, limitation, rule, order, license, stipulation agreement, or permit of the state or any instrumentality, agency or political subdivision thereof which was issued prior to the date the alleged violation occurred or is likely to occur or any conduct which materially adversely affects or is likely to materially adversely affect the environment.

Minn.Stat. § 116B.02, subd. 5 (1990).

The statute is couched in general terms, leaving to the agencies the duty of determining precisely what standards will fulfill the environmental policy enunciated by the legislature. *See Reserve Mining Co.*, 256 N.W.2d at 838. If the legislature authorizes the proposed facility, the commission should determine the standards that are appropriate under the Minnesota Environmental Rights Act and the Minnesota Environmental Policy Act and apply those standards to the proposed facility.

## DECISION

The commission erred in determining that NSP need not obtain express legislative authorization for its proposed facility. The commission properly determined that the proposed storage facility is in the public interest. In light of our determination that the proposed facility is properly classified as one in which waste is permanently stored, a supplemental EIS may be necessary. The commission should determine the appropriate standards under the Minnesota Environmental Rights Act and the Minnesota Environmental Policy Act and apply those standards to the proposed facility.

**Affirmed in part, reversed in part, and remanded.**