In the **MATTER OF THE NORTHERN STATES POWER COMPANY APPLICATION FOR CERTIFICATE OF SITE COMPATIBILITY FOR THE GOODHUE COUNTY INDEPENDENT SPENT NUCLEAR FUEL STORAGE FACILITY.**

Nos. C1–96–2189, C8–96–2190.

Court of Appeals of Minnesota.

May 13, 1997.

Lenor A. Scheffler, Joseph M. Paiement, Welch, for Relator Prairie Island Indian Community.

Hubert H. Humphrey, III, State Attorney General, Alan R. Mitchell, Assistant Attorney General, St. Paul, for Respondent Minnesota Environmental Quality Board.

Peter A. Koller, Michael J. Ahern, Moss & Barnett, Minneapolis; and Michael C. Connelly, Minneapolis, for Respondent Northern States Power Company.

Considered and decided by CRIPPEN, P.J., and PETERSON and MARTIN J. MANSUR, JJ.*

## OPINION

CRIPPEN, Judge.

Acting under a 1994 statute, respondent Northern States Power Company requested

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-     pointment pursuant to Minn. Const. art. VI, § 10.

that the Minnesota Environmental Quality Board issue a Certificate of Site Compatibility for a proposed Goodhue County dry cask storage facility. Challenging the denial of this request, relator Prairie Island Indian Community disputes the board's reliance on risks associated with the transportation and handling of the spent fuel, contending that the board should compare the sites independent of this consideration. We affirm.

## FACTS

Northern States Power Company has a spent fuel storage problem at its Prairie Island nuclear power plant in Goodhue County. The company needs to move nuclear fuel assemblies [1] from on-site cooling pools into more permanent storage until the United States government opens an interim or permanent storage facility. It is scientifically feasible to store the spent fuel assemblies in dry casks.[2]

■ In 1989, the company first proposed building a Prairie Island facility to hold 48 dry casks.[3] It sought a certificate of need from the Minnesota Public Utilities Commission pursuant to Minn.Stat. § 216B.243 (1990). In 1992, after relator opposed the expanded use of the Prairie Island site, the commission authorized the company to use 17 casks. When relator and others appealed this decision,[4] we reversed, holding that the commission lacked authority to issue a certificate of need because dry cask storage is permanent for purposes of a Minnesota law requiring legislative approval of a "permanent" radioactive waste storage facility. *In re Independent Spent Fuel Storage Installation*, 501 N.W.2d 638, 648 (Minn.App.1993), *review denied* (Minn. July 15, 1993).

In 1994, the Minnesota legislature enacted statutes recognizing that all other administrative prerequisites had been met and authorizing Northern States to store some spent nuclear fuel in dry casks at it. existing Prairie Island facility. 1994 Minn. Laws ch. 641, arts. 1, 6 (codified at Minn.Stat. §§ 116C.77–.80 (1996)). The legislation authorized immediate use of five casks and allowed the company to use four additional casks on Prairie Island upon a determination that it (1) has filed a license application with the U.S. Nuclear Regulatory Commission for a separate dry cask storage facility elsewhere in Goodhue County, (2) "is continuing a good faith effort to implement the [other Goodhue County] site," and (3) has arranged for the use of an additional 100 megawatts of wind power.[5] Minn.Stat. § 116C.771(a), (b).

After enactment of the 1994 legislation, the company began the process of selecting a separate Goodhue County site for a new dry cask storage facility. It fulfilled its license application and wind power obligations, and it eventually identified two possible sites in Florence Township for the storage facility.

In July 1995, Northern States submitted an application to the Environmental Quality Board under Minn.Stat. § 116C.80, subds. 2, 3, seeking a Certificate of Site Compatibility for the second Goodhue County site. The statute provides that prior to the construction of a separate dry cask storage facility, the company must obtain a certificate from the board that "the site for the facility is comparable to the independent spent fuel storage facility site located on Prairie Island." *Id.*, subd. 2. It also requires that the board adopt "those procedures, considerations, and rules it determines are necessary

1. Spent fuel assemblies are the rods removed from nuclear reactor units.

2. A dry cask is a large, sealed canister that holds up to 40 spent fuel assemblies.

3. A dry cask storage facility, by law, is categorized as a permanent storage facility. *In re Independent Spent Fuel Storage Installation*, 501 N.W.2d 638, 648 (Minn.App.1993), *review denied* (Minn. July 15, 1993). Notwithstanding this legal description, a dry cask facility represents a temporary solution because the U.S. government ultimately will move the spent fuel to a federal

storage installation or geological repository. *Id.* at 640–41.

4. Relator, the Minnesota Public Interest Research Group, and the Prairie Island Coalition Against Nuclear Storage filed petitions for a writ of certiorari, and we granted amicus status to the Prairie Island Religious Task Force and certain state legislators.

5. The statute also provided for an additional eight casks at Prairie Island upon the satisfaction of certain additional criteria. Minn.Stat. § 116C.771(c) (1996).

to designate a site for a dry cask storage facility." *Id.*, subd. 3.

In October 1996, the board ended the alternative siting process by denying the company's compatibility certificate application. The board concluded that the proposed sites were not comparable to the Prairie Island site solely because of the increased transportation and handling risks associated with moving the casks from the cooling pools on Prairie Island. The board's order also formally requested the company to withdraw its federal license application and authorized the board to seek suspension of those licensing proceedings.

Northern States also requested the board to determine that it had complied with the section 116C.771(b) prerequisites for authorizing the use of four additional casks at Prairie Island. In an order dated the same day as the comparability decision, the board concluded that the company had complied with the statutory mandates, including the "good faith effort" requirement respecting implementation of the proposed alternative site plan. The board premised its good faith finding on the company's cooperation with the board's informational requests, its attendance at public meetings of the Site Advisory Task Force, and its prompt payment of assessments to reimburse the board's application processing costs.

Relator Prairie Island Indian Community challenges both orders on appeal but dwells almost singularly on the proposition that the board erred by halting implementation of the Goodhue County siting process. Specifically, relator contends that the board based its compatibility decision not on the deficiencies of the physical "site for the facility" as required by section 116C.80, but instead on transportation and handling risks. The board made findings on radiological health, flooding, accidental release, and sabotage and terroristic security considerations, and observed that these considerations posed no

greater risks at the alternative site. But the board concluded that the increased transportation and handling risks associated with moving the casks to the proposed site "will always make another Goodhue County site not comparable to the Prairie Island facility."

■■ The parties do not dispute that relator has standing to appeal both orders.[6]

## ISSUE

Did 1994 Prairie Island legislation call for making an alternate site comparability decision without considering risks associated with transporting and handling nuclear waste?

## ANALYSIS

■■ By statute, an appellate court may reverse or remand an administrative agency's decision if it exceeds statutory authority, contains other errors of law, or is arbitrary or capricious. Minn.Stat. § 14.69 (1996). The party appealing an agency decision has the burden of proving that the agency decision violates a provision of Minn.Stat. § 14.69. *Markwardt v. State, Water Resources Bd.*, 254 N.W.2d 371, 374 (Minn. 1977).

### 1. Site Comparability

Relator does not dispute any findings of the board or the factual accuracy of its ultimate conclusion that transportation and handling risks will "always" exceed other considerations. The board made extensive findings on the risks associated with transporting and handling the spent fuel between Prairie Island and the alternate Goodhue County site.

Regarding handling risks, the board found that shipment to the proposed site would raise additional hazards not encountered with the Prairie Island facility because "that facility is located immediately adjacent to" the nuclear plant. The board found that workers

---

**6.** The 1994 legislation required the governor, on behalf of the state, and Northern States to enter into an agreement binding the parties to the terms of section 116C.771, among other things, and expressly granted relator Prairie Island Indian Community standing to enforce this agreement as an intended third-party beneficiary.

Minn.Stat. § 116C.773 (1996). Thus, relator has standing on the good faith issue pursuant to statutory right. Relator also has standing on the comparability issue because the rights of relator's members are at stake and the board premised its finding of good faith on Northern States' satisfaction of the underlying agreement's terms.

involved in transferring the spent fuel into shipping casks, loading these casks onto a train, transporting them by rail, removing them from the train, and transferring the spent fuel into storage casks could encounter a cancer incidence rate "as high as 18 cancers per 1,000 if one worker were to be involved with 48 casks," which is a "relatively high risk."

Regarding transportation, the board first found that although more than 2,500 shipments of spent nuclear fuel have occurred throughout the United States without any adverse radiological consequences to the public, "railway accidents are not uncommon" and experts have observed that there is "always a chance" that nuclear fuel transportation accidents will occur. It also noted that "full-scale destructive testing has not been completed on spent fuel transportation containers." The board identified such potential risks as increased radiation exposure and increased non-radiation accidents that could affect both workers and the general public. As a result, the board concluded that the transportation of the spent nuclear fuel to a second site and the additional handling required by such a transfer will "always" destroy the comparability of an alternate Goodhue County site to the Prairie Island facility.

On appeal, relator simply contends that the board could not consider the transportation and handling risks as a matter of law or, if the board could consider such risks, that it could not use them to trump all other considerations.

▆▆▆ On matters of statutory interpretation, the reviewing court generally is not bound by the determination of an administrative agency. *Arvig Tel. Co. v. Northwestern Bell Tel. Co.*, 270 N.W.2d 111, 114 (Minn. 1978). But we should defer to the agency's expertise if a statutory interpretation is complicated and technical in nature. *See In re Proposal by U.S. WEST Communications, Inc.*, 558 N.W.2d 777, 779 (Minn.App.1997) (stating that "the usual deference" to an agency decision does not apply where a court addresses "a relatively uncomplicated statutory interpretation"). A reviewing court will deem an agency decision arbitrary and capri-

cious "if the agency relied on factors which the legislature had not intended it to consider." *Trout Unlimited, Inc. v. Minnesota Dep't of Agric.*, 528 N.W.2d 903, 907 (Minn. App.1995), *review denied* (Minn. Apr. 27, 1995).

All parties acknowledge that the legislature did not directly address the inclusion or exclusion of transportation and handling risks. The parties view this silence oppositely; relator views it as the absence of authority to consider these risks, while respondents construe it as a failure to prohibit such consideration.

We begin examining this issue of statutory interpretation by observing that Minn.Stat. § 116C.80, subds. 2, 3 (1996), speaks in terms of comparing one "site" with another. While the study of a site might normally dwell on the characteristics of the place, it is evident that a reviewing authority could not properly examine the selection of a storage facility site without considering the consequences of operating the facility at that site, and its review of those consequences necessarily includes the transportation of the nuclear waste to that facility. The issue is no different, we conclude, than the feasibility study for a commercial or industrial site, which would have to consider traffic problems created by a business operation on the site, including those related to deliveries of goods or merchandise.

Relator contends that we must assume that the legislature foreclosed the board's consideration of transportation risks because it anticipated dry cask storage at a site other than Prairie Island. *See* Minn.Stat. § 116C.777 (1996) ("The spent fuel contents of dry casks located on Prairie Island must be moved *immediately* upon the availability of another site for storage of the spent fuel that is not located on Prairie Island."). On the contrary, the legislature contemplated the continued presence of dry casks at Prairie Island by authorizing the immediate storage of spent fuel assemblies in at least five dry casks at the Prairie Island facility and the potential use of up to 12 additional

casks.[7] Minn.Stat. § 116C.771(a)–(c) (1996). Thus, the legislature expressly authorized some dry cask storage at Prairie Island and provided conditions for the expanded use of casks.

Moreover, although section 116C.777 shows the general legislative will for ultimately moving the dry casks off of Prairie Island, the legislature expressly conditioned this movement upon the "availability" of a comparable site within Goodhue County. Minn.Stat. § 116C.777. That is, the legislature required that the location and the operation of the proposed facility in Goodhue County be comparable to leaving the casks at Prairie Island. Rather than define the mandate of section 116C.80 for a comparability determination, section 116C.777 merely begs for interpretation of the comparability issue.

■ Ultimately, relator's case rests entirely on its view of legislative silence, namely, that the legislature did not direct the board to consider transportation risk. Because the legislature specifically delegated the comparability issue to the board and did not prohibit the board from considering transportation risks, we conclude that it necessarily foresaw the board's consideration of all factors bearing on comparability. Minn.Stat. § 116C.80, subds. 2, 3. And the legislative history, which demonstrates legislative awareness of transportation risks, suggests that the legislature, through its silence, intended to defer to the board's judgment on this issue. *See Hearing on H.F. No. 2140/S.F. No. 1706 Before the House Conference Committee* (Apr. 26, 1994) (discussing the risks of transporting nuclear waste). Although the statute does not mandate the consideration of the health, flooding, and safety concerns, it anticipates these factors as well as the transportation and handling risks. We find inescapable the conclusion that the legislature's decision not to prohibit assessment of transportation and handling risks demonstrates that the board was within its prerogative to evaluate these risks in determining the comparability of siting the facility in Goodhue County.

In addition, given that our construction of the statute matches the board's interpretation, it is appropriate to recognize some deference to the board in this case. The legislature authorized this agency to implement and to construe the 1994 legislation. *See* Minn. Stat. § 116C.80, subd. 3 (requiring the board to adopt "those procedures, considerations, and rules it determines are necessary to designate a site for a dry cask storage facility and to issue a certificate of site comparability"). We conclude that the 1994 legislation does not present the kind of uncomplicated statutory interpretation that we should decide without some deference.

Finally, we observe that relator's grievance is not with the arbitrariness or capriciousness of the board, but with the legislature's failure to enact the law that relator desired, namely, one that requires the board to consider the comparability of the Goodhue County site independent of the transportation and handling risks. In other words, this court's 1993 Prairie Island decision denied the power company the opportunity to engage in any dry cask storage on Prairie Island unless it secured legislative authorization for that action; the company successfully obtained legislation that now serves to permit its use of nine casks at its nuclear power plant site.

### 2. Other Issues

■ Relator also alleges that the board exceeded its authority by directing Northern States to withdraw its federal license application and authorizing the board's request for suspension of the application proceedings. On appeal, the board argues that this issue has become moot because the U.S. Nuclear Regulatory Commission already has granted Northern States' request to suspend its license application pending this appeal. If an event occurs during the pendency of an appeal that "makes a decision on the merits unnecessary or an award of effective relief impossible," we will dismiss the appeal as moot. *In re Welfare of A.M.P.*, 507 N.W.2d 616, 621 (Minn.App.1993). Because this issue became moot when the federal commis-

---

7. Northern States could use the additional 12 casks on the occurrence of certain conditions under subsection (b), which allowed four addi-

tional casks, and subsection (c), which authorized eight additional casks. Minn.Stat. § 116C.771(b), (c) (1996).

sion suspended the application pending this appeal, we need not address it.

Finally, relator contends that the board erroneously found that Northern States is continuing to make a good faith effort to implement the proposed site because the company stopped making any such effort when the board ended the alternate siting process. This argument depends entirely upon whether the board erred or whether the power company had some opportunity to implement the site despite the board's decision. We decide that no error occurred and that Northern States could not move casks to another site without a certificate of compatibility.

### DECISION

Because the 1994 legislation does not preclude the consideration of risks associated with transporting and handling spent nuclear fuel between the Prairie Island power plant and a new site for a dry cask storage facility in Goodhue County, the board's decision that the proposed site would not be comparable to the Prairie Island facility is neither erroneous nor arbitrary and capricious.

**Affirmed.**