**In the Matter of the Application of NORTHERN STATE POWER COMPANY FOR APPROVAL OF ITS 1998 RESOURCE PLAN.**

No. C0–99–917.

Court of Appeals of Minnesota.

Jan. 18, 2000.

Elizabeth I. Goodpastor, O'Neill, Grills & O'Neill, PLLP, St. Paul, and Elizabeth H. Schmiesing, Brian B. O'Neill, Richard A. Duncan, Faegre & Benson, LLP, Minneapolis, MN (for relator North American Water Office).

Timothy R. Thornton, Scott G. Knudson, Briggs & Morgan, P.A., Minneapolis, MN (for respondent NSP).

Mike Hatch, Attorney General, Thomas E. Bailey, Assistant Attorney General, St. Paul, MN (for Minnesota Public Utilities Commission).

Carol A. Overland, Overland Law Office, Northfield, MN (amicus curiae for Communities United for Responsible Energy (C.U.R.E.)).

Considered and decided by SHORT, Presiding Judge, ANDERSON, Judge, and MULALLY,* Judge.

## OPINION

G. BARRY ANDERSON, Judge.

On appeal from an administrative proceeding, relator challenges approval given to respondent Northern States Power permitting modification of nuclear waste storage at the Prairie Island nuclear generating plant. Because the modification does not require legislative approval, and the administrative procedure employed did not violate state law, we affirm.

## FACTS

The history of this case can be traced to the failure of Congress and the federal government to fulfill a compact to construct and, in 1998, to begin receiving high-level nuclear waste generated by this country's nuclear power plants. In April 1991, sensing this impending failure, respondent Northern States Power (NSP) petitioned in an Application for a Certificate of Need to respondent Minnesota Public Utilities Commission (commission)

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

for approval of temporary storage of nuclear waste in dry metal casks at the Prairie Island nuclear generating plant. Such storage was necessary because NSP's in-plant temporary storage facility, a large cooling pool, would have reached maximum capacity in 1995. In August 1992, the commission approved NSP's request, although modifying the requested number of casks from NSP's requested 48 to 17. A condition to the approval was that NSP establish cooling pool storage space for a full core off-load,[1] which entailed the ability to store the 121 fuel assemblies from each of Prairie Island's two reactors—for a total of 242 assemblies.

As part of its limited certificate of need order approving NSP's plan to store waste in the 17 casks, the commission determined that state legislative approval of dry cask storage was unnecessary. This court disagreed, concluding that Minnesota's Radioactive Waste Management Act prohibited the dry cask storage absent legislative approval. *In re Application for Certificate of Need for Indep. Spent Fuel Storage Installation (ISFSI)*, 501 N.W.2d 638, 648 (Minn.App.1993), *review denied* (Minn. July 15, 1993).

In response to *ISFSI*, the legislature passed legislation approving of the 17 dry casks. *See* Minn.Stat. §§ 116C.77, 771 (1994). The legislature also authorized a "third reracking" of the storage pool. Minn.Stat. § 116C.778 (1994). Prior to requesting approval for the dry cask storage, NSP had reracked the storage pool on at least two occasions, in 1977 and 1981, which entailed restructuring the storage racks in the storage pools to permit greater capacity. Further, the legislature did not foreclose commission consideration of additional dry cask storage in connection with the decommissioning of a nuclear power plant. Minn.Stat. § 116C.771(e) (1994).

The present controversy began in January 1998, when NSP filed its application for resource plan approval 1998–2012 (resource plan) with the commission. The resource plan, required by statute, details a utility's options to meet the service needs of its customers. *See* Minn.Stat. § 216B.2422 (1998).

As part of its resource plan, NSP requested approval to create 195 temporary storage spaces in the cooling pool. In the event of a full core off-load into that area, NSP explained that the temporary storage racks would be moved to a portion of the storage pool. NSP proposed a dual use of that portion of the storage pool, now used as the dry cask lay down area to facilitate insertion of fuel rods into dry casks, so that the temporary storage racks could be accommodated there if a full core off-load was necessary. The Nuclear Regulatory Commission has approved this dual plan for temporary storage.

A party, not on appeal, challenged the resource plan. The commission responded by holding statewide hearings in December 1998. All hearings were moderated by an administrative law judge and attended by members of the commission. Several citizens groups submitted written comments, which were entered into the public record. In January 1999, all intervening parties presented oral argument.

On February 17, 1999, the commission approved NSP's resource plan, with modifications to separate portions of the resource plan, which are not on appeal. The commission approved NSP's storage pool proposal, concluding the resource plan neither violated statutory mandate nor the 1992 limited certificate of need. On March 8, 1999, relator petitioned the commission to reconsider its decision. Relator argued that NSP's plan violated the statutory intent of limiting the total amount of nuclear waste stored at Prairie Island. The com-

---

1. A full core off-load is the process of removing all the fuel assemblies from the two nuclear reactor cores at Prairie Island, and then placing the assemblies into the storage pool.

The off-load would be necessary when, for example, NSP wanted to work on the reactors.

mission rejected relator's reconsideration request.

Relator filed its writ of certiorari with this court for a review of the commission's decision to allow NSP to modify its storage procedures. This court has granted leave to Communities United for Responsible Energy (C.U.R.E.) to file a brief as amicus curiae. By previous order, this court rejected NSP's claim that certiorari does not lie in this case because the commission's decision was not "quasi-judicial."

## ISSUES

I. Did the Minnesota Public Utilities Commission err in granting Northern States Power's plan to revise its temporary storage plan?

II. Did the Minnesota Public Utilities Commission employ incorrect procedure to grant Northern States Power's plan to revise its temporary storage plan?

## ANALYSIS

[redacted] An administrative agency's decision will be sustained on appeal "unless it 'reflects an error of law, the determinations are arbitrary and capricious, or the findings are unsupported by the evidence.' " *Glazier v. Independent School Dist. No. 876,* 558 N.W.2d 763, 766 (Minn.App.1997) (quoting *County of Scott v. Public Employment Relations Bd.,* 461 N.W.2d 503, 504 (Minn.App.1990), *review denied* (Minn. Dec. 20, 1990)).

The scope of judicial review of administrative decisions is provided in Minnesota's Administrative Procedure Act:

> [T]he court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
>
> (a) In violation of constitutional provisions; or
>
> (b) In excess of the statutory authority or jurisdiction of the agency; or
>
> (c) Made upon unlawful procedure; or
>
> (d) Affected by other error of law; or
>
> (e) Unsupported by substantial evidence in view of the entire record as submitted; or
>
> (f) Arbitrary or capricious.

Minn.Stat. § 14.69 (1998).

### I.

[redacted] We first examine relator's challenge to the commission's approval of NSP's temporary storage proposal. Although rejected at the administrative level, on appeal relator argues that NSP's proposal results in an increase of the nuclear waste storage capacity at Prairie Island, in violation of state legislation.

This case highlights the statutory tension created between the authority of the commission and the legislature over control of the state's nuclear power industry. While the commission is entrusted to administer state utilities, including nuclear power plants, *see* Minn.Stat. § 216B.08 (1998), the legislature has reserved "all legal authority for the purpose of regulating the disposal and transportation of high level radioactive waste." Minn.Stat. § 116C.705 (1998). There is no dispute that this case concerns "high level radioactive waste." What is at issue is whether this case triggers a requirement for further legislative approval of NSP's proposed temporary storage modification.

In 1993, this court rejected the commission's approval of NSP's request to store nuclear waste in dry casks absent legislative approval. *ISFSI,* 501 N.W.2d at 648. The *ISFSI* court noted that the legislature had limited the commission's authority to approve nuclear waste storage or disposal facilities. *Id.* at 643. This court concluded that because the legislature intended to retain authority over nuclear waste that is either retrievably or irretrievably stored, approval for the dry cask containers re-

quired legislative authorization. *Id.* at 648.

The statutory provisions at issue in *ISFSI* remain intact. The legislature has retained sole authority for the construction or operation of a "radioactive waste management facility within Minnesota." Minn. Stat. § 116C.72 (1998). A radioactive waste management facility is defined as

a geographic site, including buildings, structures, and equipment in or upon which radioactive waste is retrievably or irretrievably disposed by burial in soil or permanently stored.

Minn.Stat. § 116C.71, subd. 7 (1998).

Yet while relator's argument relies on the statutory provisions which reserve for the legislature control of such storage issues, its argument overlooks the authority held by the commission to manage a full core off-load at Prairie Island.

In approving NSP's temporary storage plan, the commission relied on its 1992 order granting a limited certificate of need for NSP's dry-cask storage request, which also recognized NSP's need to reserve pool storage space for a full core off-load. Although enough pool space did not exist in 1992, the commission ordered that NSP reserve such space when it became available. Critically, the commission conditioned this requirement on "the absence of a Commission Order to the contrary."

When the legislature granted NSP's use of dry cask storage after *ISFSI*, it also explicitly ratified the commission's 1992 limited certificate of need. Minn.Stat. § 116C.77. The certificate of need was approved in accordance with the legislative conditions regarding NSP's use of dry cask storage. *Id.* Those conditions are not at issue on appeal. Because the commission's 1992 grant of a limited certificate of need required full core off-load storage space, yet reserved for the commission the authority to modify this requirement, the legislature's subsequent ratification implies ratification of the commission's authority over this issue, including the power to repeat, amend or change the requirement if it sees fit.

"Although agency decisions are presumed correct and are typically accorded deference by the judiciary, deference does not extend to an agency's interpretation of a statute." *ISFSI*, 501 N.W.2d at 642–43 (citing *In re Petition of Fritz Trucking, Inc.*, 407 N.W.2d 447, 450 (Minn. App.1987)). "Questions of statutory construction are questions of law and are fully reviewable by an appellate court." *Metropolitan Sports Facilities Comm'n v. County of Hennepin*, 561 N.W.2d 513, 515 (Minn.1997) (citation omitted). The court of appeals reviews an interpretation of the law de novo. *Winkler v. Magnuson*, 539 N.W.2d 821, 825 (Minn.App.1995).

Despite this court's authority to conduct de novo review of an agency's statutory interpretation, this court recently noted that

when an agency reasonably interprets a statute, it is the role of the legislature or the supreme court, and not the role of this court, to overrule that interpretation.

*In re University of Minn.*, 566 N.W.2d 98, 103 (Minn.App.1997) (citation omitted). Moreover, when a statute is couched in general terms, the agency is left "the duty of determining precisely what standards will fulfill the environmental policy enunciated by the legislature." *ISFSI*, 501 N.W.2d at 649; *see also Bankruptcy Estate of United Shipping Co., v. Tucker Co.*, 474 N.W.2d 835, 839 (Minn.App.1991) (" '[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer.' ") (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)), *review denied* (Minn. Oct. 31, 1991).

Despite relator's arguments, there is nothing in the legislation that hints that the legislature intended a particular shutdown date for Prairie Island. Moreover,

the legislative history shows that the legislature rejected such a notion, when it denied individual attempts to include a date in the present legislation. As the commission noted in its approval of NSP's plan:

> [H]ad the Commission or the Legislature meant to require NSP to shut down Prairie Island at the end of 2001, they would have said so, either directly or by placing explicit conditions on the [limited certificate of need] which would have accomplished that goal. For example, they could have required a particular method of achieving full core off-load, limiting the amount of storage space available.

The legislature did not so limit, and, moreover, section 116C.77 grants to the commission the authority to regulate NSP's full core off-load requirements. Additionally, if the legislature wished to reserve to itself the authority to handle procedures to handle full core off-loading, including the issue of nuclear storage during the off-loading process, it could have done so. It has left that issue to the discretion of the commission and we will not disturb that decision.

While the commission's decision may permit NSP to eventually create and store more waste in the storage pool at Prairie Island, such a result is not prohibited by existing legislation.

## II.

 Next, relator argues that the commission used incorrect administrative procedure to approve NSP's proposal for the temporary storage requirements. Relator argues that NSP's proposal should have been raised through an application for a certificate of need. Relator raises this issue for the first time in its writ. This court will generally not consider matters not argued and considered in the court below. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988). Nevertheless, appellate courts "may review any other matter as the interest of justice may require." Minn. R. Civ.App. P. 103.04.

The rejection of relator's present contention is implied in our decision on the previous issue. The applicable statutory language requires an application for a certificate of need for the construction of a "large energy facility." Minn.Stat. § 216B.243, subd. 4 (1998). A "large energy facility" is defined to include "any * * * nuclear waste storage or disposal facility." Minn.Stat. § 216B.2421, subd. 2(g) (1998). Because NSP's proposal does not trigger the nuclear waste storage language of the Radioactive Waste Management Act as requiring legislative approval for NSP's present proposal, it only follows that the proposal equally does not trigger the language requiring an application for a certificate of need. Coupled with the legislature's 1994 approval of the limited certificate of need, determinative on this issue, we reject relator's procedural challenge.

Finally, because of our approval of NSP's temporary storage plan, we need not reach its federal preemption argument.

## DECISION

The Minnesota legislature approved the commission's 1992 limited certificate of need, which also imposed on NSP certain requirements for handling full core off-loading requirements of the reactors at the Prairie Island nuclear generating plant. The commission's 1992 grant also reserved unconditional authority over the handling of full core off-loading procedures. The commission acted within its statutory authority when granting NSP's requested modification of its off-load storage requirements.

**Affirmed.**