In the Matter of the REVIEW OF the 2005 ANNUAL AUTOMATIC ADJUSTMENT OF CHARGES FOR ALL ELECTRIC AND GAS UTILITIES.

No. A07–653.

Supreme Court of Minnesota.

July 16, 2009.

Lori Swanson, Attorney General, Alison Crawford Archer, Assistant Attorney General, Saint Paul, Minnesota, for appellant.

Eric F. Swanson, David M. Aafedt, Winthrop & Weinstine, P.A., Minneapolis, Minnesota, for respondent.

## OPINION

ANDERSON, PAUL H., Justice.

CenterPoint Energy Minnesota Gas ("CenterPoint"), a division of CenterPoint Energy Resources Corp., appeals the Minnesota Public Utility Commission's denial of its variance request made to recoup unrecovered natural gas costs incurred during CenterPoint's 2000–2004 billing cycles. CenterPoint argues that the Commission's decision to deny the variance request was arbitrary and capricious, especially in light of the Commission's two earlier decisions granting a variance to two other companies. The Minnesota Court of Appeals reversed the Commission, holding that the Commission's denial was arbitrary and capricious. We reverse.

On April 5, 2006, CenterPoint requested that the Minnesota Public Utilities Commission grant a variance that would allow CenterPoint to recoup previously unrecovered natural gas costs. Under Minnesota's regulatory scheme, utility companies are not allowed a profit from supplying natural gas to their customers. Minn.Stat. § 216B.01 (2008). Rather, a utility company is required pass the costs of supplying natural gas along to customers without any mark-up. *Id.*

Because the price of natural gas is unpredictable, Minnesota's regulatory scheme requires utility companies such as CenterPoint to perform monthly adjustments to determine whether the costs charged to customers accurately reflect the current market value of natural gas. Minn. R. 7825.2910 (2007). A utility company must estimate the cost of the gas for the following month in order to calculate a purchase gas adjustment. *Id.* The calculation of the adjustment largely determines what consumers are charged for natural gas for the next month. *Id.*

As an oversight mechanism to ensure utility companies are accurately charging their customers, the regulations require that each year the utility company must complete an annual "true-up" filing. Minn. R. 7825.2700, subp. 7 (2007); 7825.2910, subp. 4. In a true-up filing, the utility company must determine "the difference between the commodity and demand gas revenues" and the "actual commodity" costs over the past twelve-month period. Minn. R. 7825.2700 subp. 7. If the true-up filing reveals a difference, whether a deficit or a surplus, the difference is corrected on the gas billings for the following twelve-month period. *Id.*

Following its 2004–5 true-up filing, CenterPoint discovered that it had been under-recovering gas costs going back to 2000. Initially, CenterPoint believed it had accurately stated its natural gas supply costs but had miscalculated sales volume, resulting in overstated revenues credited against the gas costs. The accounting errors caused CenterPoint to under-recover the full gas costs it incurred during that time period.

The accounting errors were the result of system accounting changes CenterPoint made in 2000. Unknown to CenterPoint, the accounting changes resulted in two basic flaws in the monthly accounting system. First, the new system miscalculated the amount of lost and unaccounted-for gas. Second, because CenterPoint sought to accelerate the month-end accounting processes, it began to estimate the amount of the unbilled sales remaining to be made that month before the month actually ended. Because the change was not implemented correctly, CenterPoint accumulated unbilled volumes of natural gas. CenterPoint explained that on "either a monthly or an annual basis, the misstatement of unbilled volumes associated with these two factors was not sufficiently large to stand out and call for further analysis." CenterPoint became aware of the losses only when the cumulative amount of unbilled volumes became "unreasonably large."

When CenterPoint filed its correction with the Commission in 2006, the company explained that it had under-recovered approximately $9.2 million during the current 2004–5 true-up period and $12.6 million during the 2000–4 true-up years. Minnesota's regulatory scheme prevents a utility company from recovering for any deficit in gas recovery beyond the current true-up year. Minn. R. 7829.3200 (2007). If a company fails to recover all of its gas costs in the current year's true-up filing, any deficit can only be recovered through a variance. *Id.* The variance rule provides that the Commission "shall grant a vari-

ance to its rules" if the following requirements are met: (a) enforcement of the rule would impose an excessive burden upon the applicant or others affected by the rule; (b) granting the variance would not adversely affect the public interest; and (c) granting the variance would not conflict with standards imposed by law. Minn. R. 7829.3200, subp. 1. CenterPoint sought a variance from the Commission to allow it to recover from its customers the nearly $12.6 million in gas costs it had failed to recoup in the 2000–4 time period.

After receiving CenterPoint's variance request, the Commission asked for and received filings and comments from CenterPoint, the Minnesota Office of the Attorney General Residential and Small Business Utilities Division, and the Minnesota Department of Commerce. Filings and comments were received through 2006. Both the Attorney General and the Department of Commerce objected to granting a variance for CenterPoint's unrecovered gas costs. In October 2006, CenterPoint submitted supplementary comments indicating it had discovered further unrecovered costs from the same 2000–4 time period. Although CenterPoint initially believed it had accurately calculated its natural gas supply costs, CenterPoint now claimed those calculations had also been incorrect. As a result, CenterPoint amended the amount of its total unrecovered costs for 2000–5 to $28.3 million.

In its variance filings, CenterPoint proposed that its losses be recovered over a three-year time period at a total estimated cost of approximately $30 per consumer. CenterPoint suggested the recovery begin in November 2007 so that the extra cost to customers would coincide with anticipated savings resulting from CenterPoint's new long-term service agreements for pipeline transportation. In support of its argu-

ment that the Commission should grant a variance, CenterPoint relied on two prior Commission decisions concerning NSP Gas and Interstate Gas, *In the Matter of the Review of the 1997 Annual Automatic Adjustment of Charges for All Gas & Electrical Utilities (Interstate)*, MPUC Docket No. G, E–999/AA–97–1212 (May 28, 1998) and *In the Matter of the Review of the 1994 Automatic Adjustment of Charges for All Gas & Electrical Utilities (NSP)* MPUC Docket No. G, E–999/AA–94–762 (July 13, 1995).

In both *NSP* and *Interstate*, the Commission granted a variance to the purchase gas adjustment true-up rule that allowed the utility company to recover natural gas costs incurred outside the one-year lookback period provided for by rule. *Interstate*, at 4; *NSP*, at 8. In 1995, the Commission granted NSP a variance for over $1.05 million in unrecovered costs that were incurred in 1992–93 and reported to the Commission in 1994. *NSP*, at 5. In NSP's case, the unrecovered costs were due to an internal reporting change that occurred in NSP's efforts to comply with FERC 636, a federal regulation that required NSP to treat its transportation services separately from its gas provider services. Id. at 8–9. The *Interstate* variance was granted in 1998 and allowed Interstate to recover for inadvertently-omitted costs in the amount of $164,781 for the billing years of 1994–95 and 1995–96. *Interstate*, at 4–5. In both the *NSP* and *Interstate* cases, the Department of Commerce agreed to the variance after performing an analysis of the claims and the utilities' accounting practices. *NSP*, at 5–9; *Interstate*, at 4.

In November 2006, the Commission considered and denied CenterPoint's request to recover $20.9 million in unrecovered costs for the 2000–4 time period. In looking at the first variance factor listed in

Minn. R. 7829.3200, subp. 1—excessive burden—the Commission found denial of recovery did not impose an excessive burden on CenterPoint. To support its conclusion, the Commission said: (a) CenterPoint had represented in its April 5, 2006, filing that the unrecovered amounts were too small and insignificant on a monthly or annual basis for detection; (b) CenterPoint had submitted improper calculations on the effect of the unrecovered costs because CenterPoint had compared all four years of unrecovered cost to one year of operating income; (c) the Department of Commerce had calculated that the unrecovered costs equaled approximately 0.5% of CenterPoint's gas costs over the five-year period in question; (d) the Department of Commerce had analyzed the financial data and found only $2.4 million in errors, equal to approximately 1.6% of CenterPoint's reported annual net income over that time period; and (e) CenterPoint had failed to prove that two intervening rate cases had not compensated the company for the unrecovered costs.

The Commission also found that granting CenterPoint's variance was not in the public interest, and therefore concluded that CenterPoint had not established the second factor necessary for a variance request. *See* Minn. R. 7829.3200, subp. 1. The Commission explained the public interest was served by ensuring customer charges are accurately calculated on an annual basis during the true-up period, and expressed concern that allowing a four-year variance would provide "literally no incentive" for utility companies to ensure their accounting practices were accurate. The Commission expressed concerns that allowing recovery would not deter CenterPoint from returning again to report even greater losses. The Commission also concluded that CenterPoint had failed to provide sufficient evidence to prove it had not recovered some of its losses in the extensive ratemaking processes performed during the time period in question.

In analyzing public interest, the Commission also looked at the equities involved in granting a variance and found that the equities did not "favor granting the extraordinary remedy of out-of-period gas-cost recovery." The Commission was concerned that the losses at issue were too minor to "pose the kind of severe financial threat that might trump general regulatory principles of inter-generational equity and the resulting practice of matching, as closely as possible, the set of ratepayers who bear costs with the set of ratepayers for whose benefit the costs were incurred." The Commission also noted that CenterPoint's losses were due to factors entirely within its control. Ultimately, the Commission said that it found "inadequate support" for CenterPoint's position to justify granting the variance.

In December 2006, CenterPoint filed a Petition for Rehearing and Reconsideration, citing "misstatements and misunderstandings of fact and errors of law." Among the errors cited, CenterPoint pointed out that the Commission had misstated CenterPoint's financial losses, stating them as $2.4 million rather than the approximately $21 million at issue. CenterPoint also provided a breakdown of how these costs matched, on an annual basis, with the company's annual return on equity. According to CenterPoint, the unrecovered costs constituted the following percentages of its annual return on equity: 0.55% in 2000; 2.68% in 2001; 15.31% in 2002; 14.24% in 2003; and 13.79% in 2004. Finally, CenterPoint contended that the two intervening rate cases, undertaken during the time period in question, had no effect on the company's recovery for gas costs.

In February 2007, the Commission met to consider CenterPoint's Petition for Rehearing and Reconsideration. After hearing CenterPoint's arguments, the Commission deadlocked, two to two, on two separate motions to reconsider the order denying the variance and as a result did not reconsider its denial of the variance. The Commission did, however, unanimously decide to amend its order to correct its mistake concerning the amount of CenterPoint's unrecovered costs.

In its amended order, the Commission stated that its denial of the variance was not punitive, reiterated that the gas costs remained "only 0.5 percent of the Company's total gas costs" for the time period in question, and emphasized that "[r]atepayers do not provide a ... backup source of cash for the Company." The Commission went on to say that *NSP* and *Interstate* were not controlling because variances are "fact-intensive and situation-specific, as well as specific to the economic conditions of the times." The Commission distinguished CenterPoint's case from the two prior cases on the grounds that "the Company's accounting errors occurred every month for a five-year period, and were due to Company-initiated changes."

Following the Commission's denial of its petition for reconsideration, CenterPoint sought certiorari review in the Minnesota Court of Appeals. The court of appeals reversed the Commission's ruling, concluding that the Commission's decision to deny CenterPoint a variance was arbitrary and capricious because the decision deviated from the Commission's prior decisions. *In Review of the 2005 Annual Automatic Adjustment of Charges for All Elec. & Gas Util.*, 748 N.W.2d 322 (Minn.App.2008). We granted the Commission's petition for review.

## I.

■ We first consider what level of deference appellate courts should afford the Commission's decisions. Under Minnesota Administrative Procedures Act we:

> may affirm the decision of the agency or remand the case for further proceedings; or [we] may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are: (a) in violation of constitutional provisions; or (b) in excess of the statutory authority or jurisdiction of the agency; or (c) made upon unlawful procedure; or (d) affected by other error of law; or (e) unsupported by substantial evidence in view of the entire record as submitted; or (f) arbitrary or capricious.

Minn.Stat. § 14.69 (2008). The appellant bears the burden of establishing that the agency findings are not supported by the evidence in the record. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn. 1977). An agency's decision is arbitrary or capricious if it represents the agency's will and not its judgment. *Markwardt v. State*, 254 N.W.2d 371, 374 (Minn.1977). A ruling is arbitrary and capricious if an agency:

> (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.

*Citizens Advocating Responsible Dev. v. Kandiyohi County Bd.*, 713 N.W.2d 817, 832 (Minn.2006).

■ We review an agency's decision independently without according any special deference to a review by lower courts.

*Id.* A presumption of correctness attaches to an agency decision, and deference is shown to an agency's conclusions in the area of its expertise. *Cable Commc'ns Bd. v. Nor–West Cable Commc'ns P'ship,* 356 N.W.2d 658, 668 (Minn.1984). We consider an agency's expertise or special knowledge when: (a) the agency is interpreting a regulation that is unclear and susceptible to more than one reasonable interpretation or the agency's interpretation is reasonable, *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater,* 731 N.W.2d 502, 515 (Minn.2007), or (b) when application of the regulation is "primarily factual and necessarily requires application of the agency's technical knowledge and expertise to the facts presented," *Minn. Ctr. for Env't Advocacy v. Minn. Pollution Control Agency (MCEA v. MPCA),* 644 N.W.2d 457, 464 (Minn.2002).

■ In *MCEA v. MPCA,* we deferred to the MPCA's decision not to require an Environmental Impact Statement because we concluded that MPCA's expertise was necessary to interpret and apply the applicable statute. *Id.* We conclude that application of the variance rule at issue here—Minn. R. 7829.3200—requires similar expertise in application. In reaching its decisions, the Commission conducted investigations, reviewed accounting practices, and solicited comments from several agencies and organizations involved in the regulatory process. The Commission also took into account its purchase gas adjustment true-up policies, knowledge of annual rate cases, and understanding of the effect on ratepayers. Ultimately the Commission had to consider its policy mandate to balance the interest of the public utility—CenterPoint—with the interests of the public. Because the decision on whether to grant a variance relies on application of the Commission's technical knowledge and

expertise to the facts presented, we conclude that the Commission's decision in this case should be afforded deference.

## II.

CenterPoint argues that the Commission failed to follow the principles set out in its prior variance cases. Therefore, we next address the question of what obligation the Commission has to follow the principles established in two prior variance cases—*NSP* and *Interstate.* Although we have not previously addressed the precise issue raised here, the question of what obligation an agency has to follow its own precedent has been extensively discussed by the federal courts.

In 1973, the United States Supreme Court held that an agency had a "duty to explain its departure from prior norms." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). This conclusion was derived from the Court's opinion that "[a] settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress." *Id.* at 807, 93 S.Ct. 2367. The Court proceeded to explain that an agency may "flatly repudiate" prior norms based on changed circumstances. *Id.* at 808, 93 S.Ct. 2367. Or the agency may "narrow the zone" in which the rule is applied because "a more discriminating invocation of the rule will best serve congressional policy." *Id.* The Court said that an agency may also find that "although the rule in general serves useful purposes, peculiarities of the case before it suggest that the rule not be applied in that case." *Id.*

The Supreme Court in *Atchison* was concerned primarily with an agency's responsibility to "clearly set forth" the rationale for its decision. *Id.* Thus, when factual differences are used to distinguish

prior decisions, the Court said that the distinction is effective "only when some legislative policy makes the differences relevant to determining the proper scope of the prior rule." *Id.* But the Court warned reviewing courts "[i]t is all too easy for a court to judge the adequacy of an asserted distinction in light of the policies the court, rather than the agency, seeks to implement." *Id.* The Court explained that "it is enough to satisfy the requirements of judicial oversight of administrative action if the agency asserts distinctions that, when fairly and sympathetically read in the context of the entire opinion of the agency, reveal policies it is pursuing." *Id.* at 809, 93 S.Ct. 2367.

 In 1982, the Eleventh Circuit articulated a more concise version of this standard in *McHenry v. Bond,* 668 F.2d 1185 (11th Cir.1982), the language of which has been widely accepted. The standard articulated in *McHenry* is that:

> An administrative agency concerned with furtherance of the public interest is not bound to rigid adherence to precedent. This does not mean, however, that an agency may abandon its own precedent without reason or explanation. An agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent.

*Id.* at 1192 (citations omitted) (internal quotation marks omitted). We find the standard developed by the federal courts to be persuasive. When an agency seeks to deviate from its prior decisions, the agency is charged with setting forth a reasoned analysis for the change. *Sierra Club v. Clark,* 755 F.2d 608, 619 (8th Cir. 1985). If a reasoned explanation is provided, the courts then review that explanation to determine whether the explanation was arbitrary and capricious. *Id.* Accordingly, we conclude that an agency must generally conform to its prior norms and decisions or, to the extent that it departs from its prior norms and decisions, the agency must set forth a reasoned analysis for the departure that is not arbitrary and capricious. *See id.*

### III.

We now turn to the question of the whether the Commission was arbitrary and capricious in denying CenterPoint's variance request. In order to grant the variance, the Commission had to conclude that: (a) "enforcement of the rule would impose an excessive burden upon the applicant or others affected by the rule;" (b) "granting the variance would not adversely affect the public interest;" and (c) "granting the variance would not conflict with standards imposed by law." Minn. R. 7829.3200, subp. 1. If CenterPoint failed to carry its burden of proof as to any one factor, the Commission appropriately denied CenterPoint's variance request.

 Because we must afford deference to the agency's decision, our review of the Commission's decision is "guided ... by the principle that the agency's conclusions are not arbitrary and capricious so long as a 'rational connection between the facts found and the choice made' has been articulated." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.,* 624 N.W.2d 264, 277 (Minn.2001). If there is room for two opinions on a matter, the Commission's decision is not arbitrary and capricious, even though the court may believe that an erroneous conclusion was reached. *Brown v. Wells,* 288 Minn. 468, 472, 181 N.W.2d 708, 711 (1970).

### A. Excessive Burden

 The first factor the Commission considered was whether "enforcement of the rule would impose an excessive burden upon the applicant or others affected by

the rule." Minn. R. 7829.3200, subp. 1. CenterPoint makes several arguments for why the Commission's failure to find an excessive burden was arbitrary and capricious. CenterPoint asserts that the Commission: (1) was inconsistent with its prior decisions when it determined that nearly $21 million in unrecovered costs was not an excessive burden; (2) was inconsistent with its decision in *NSP* when it failed to grant a variance for the two years in which unrecovered costs amounted to more than 10% of CenterPoint's return on equity; [1] (3) improperly compared the total amount of unrecovered costs to CenterPoint's total gas costs; and (4) significantly understated the amount of unrecovered costs in its first order and then failed to find an excessive burden upon learning of its mistake.

In the original order, the Commission provided several reasons for not finding an excessive burden. The Commission noted that CenterPoint's losses resulted from company-initiated changes which went unnoticed by CenterPoint for approximately five years. The Commission specifically pointed to CenterPoint's explanation of why the unrecovered costs had gone unnoticed for so many years—that the omissions were too small to be detected on a monthly or annual basis. The Commission also noted that the calculations submitted by CenterPoint were improper because CenterPoint compared "four years of errors to one year of operating income." Finally, the Commission relied on evidence that the losses amounted to only $2.4 million and that the unrecovered amounts constituted only 0.5% of the total gas costs incurred by CenterPoint during the time at issue.

After the rehearing, the Commission amended its order. In the amended order, the Commission recognized that it had been mistaken in finding that the unrecovered losses amounted to only $2.4 million and acknowledged that CenterPoint's losses were approximately $21 million. The Commission's amended order not only addressed the Commission's errors, but also provided a further explanation for the Commission's conclusion to deny the variance. The Commission explained that its two prior cases, *NSP* and *Interstate*, did not compel it to grant CenterPoint's variance because its inquiry in each case was fact-intensive and "specific to the economic conditions of the times." Reasserting its rationale from the first order, the Commission denied CenterPoint's request.

Because the Commission offered an explanation for why CenterPoint's case was different from prior decisions, we must analyze whether the explanation offered was arbitrary and capricious. *E.g., Sierra Club,* 755 F.2d 608. The Commission does not have a lengthy list of prior variance cases. In fact, the Commission has only decided two prior variance cases, and in both cases it granted the variance. The fact that the Commission has granted its two prior variance requests does not, however, lead to a presumption that the Commission is obligated to grant all subsequent requests.

In denying CenterPoint's variance request, the Commission highlighted the facts that were specific and even unique to CenterPoint's case. Thus, it appears the Commission has not articulated a new rule, nor has it varied from previous decisions. Rather, the Commission has merely "nar-

---

1. The annualized return on equity numbers were not provided by CenterPoint until the rehearing and as a result the Department of Commerce and Attorney General were not able to verify the information. At the rehear-ing, a motion was made to grant the variance with regard to the 2004 gas year when unrecovered costs in terms of return on equity exceeded 10%, and the motion failed on a 2–2 vote.

row[ed] the zone" and applied a "more discriminating invocation" of the variance rule based on the facts of CenterPoint's case. *See Atchison Topeka & Santa Fe Ry. Co.*, 412 U.S. at 807, 93 S.Ct. 2367. Therefore, we must determine whether the two prior cases in which the Commission granted variance requests are factually distinct from CenterPoint's case, where the Commission denied the request.

In analyzing the Commission's excessive burden analysis, we begin by noting the subjective aspect of the first variance factor. The variance rule requires the Commission to consider whether "enforcement of the rule would impose an excessive burden *upon the applicant* or others affected by the rule." Minn. R. 7829.3200 subp. 1 (emphasis added). The language of the rule is not focused on the size of the under-recovery, but instead instructs the Commission to consider what effect that under-recovery will have on the particular company seeking the variance. Thus, the fact that the amount of money CenterPoint failed to recover over the 2000–4 time period is greater than the amount at issue in *NSP* and *Interstate* is not determinative. The Commission is required to consider that amount in the context of its effect on CenterPoint.

As the Commission noted, there are significant factual differences between CenterPoint's case and the *NSP* and *Interstate* cases. In neither of the two prior cases had the utility company allowed unrecovered costs to accumulate on a monthly basis for such a lengthy time period—five years. CenterPoint not only failed to recover the gas costs on a regular basis over an extended period of time, but it also failed to notice the accumulation of those costs. Further, when explaining how the unrecovered amounts had gone unnoticed, CenterPoint stated that the amounts were too insignificant on a monthly or annual basis to be noticed. Thus, despite the size of the unrecovered costs as now accumulated, the fact that CenterPoint failed to notice the losses for a period of five years does suggest that the missing amounts did not excessively burden the company.

The Commission did significantly understate the amount of unrecovered costs in its first order denying the variance request, but the Commission corrected the amount in its second order, at which time it reasserted the reasons stated above for denying CenterPoint's request. The approximately $21 million at issue here is larger than the amounts at issue in *NSP* and *Interstate*. According to CenterPoint, the amount these losses represent in terms of return on equity amounted to 0.55% in 2000, 2.68% in 2001, 15.31% in 2002, 14.24% in 2003, and 13.79% in 2004, and thus did rise to levels similar to those in *NSP* at least two of the years in question. Nonetheless, CenterPoint itself has said that it failed to notice the losses over a five-year period because the accumulating losses were not noticeable on a monthly or annual basis. Therefore, we conclude that it was not arbitrary and capricious on the distinct facts of this case to suggest the unrecovered costs did not impose an excessive burden.

CenterPoint also objects to the fact that the Commission compared the unrecovered costs to the total amount of gas costs incurred by CenterPoint. The comparison may have been important in part because CenterPoint failed to provide accurate annualized figures during the Commission's initial investigation. As a result, CenterPoint's annualized return on equity numbers were not investigated or verified by an outside agency. Further, the total amount of gas costs incurred by CenterPoint is relevant to the overall size of the company—and explains how the unrecovered costs could go unnoticed for such a

long time. In fact, CenterPoint itself explained that the reason it did not detect the unrecovered costs was "because the dekatherm volumes of the misstatement in any month or year in relationship to the total throughput was so small."

Based on the record before us, we acknowledge that, ultimately, there may be room for differing opinions on whether the unrecovered costs were an excessive burden to CenterPoint. *See Wells*, 288 Minn. at 472, 181 N.W.2d at 711 (explaining that where there may be room for reasonable differing opinions, a decision is not arbitrary and capricious). But we conclude that the Commission was not arbitrary or capricious in concluding that CenterPoint had not met the excessive burden requirement when CenterPoint conceded that it failed to notice the losses for five years because they were "not sufficiently large to stand out" on a monthly or annual basis.

## B. Public Interest

▮ The second factor the Commission considered in determining whether to grant CenterPoint a variance was whether granting the variance was adverse to the public interest. Minn. R. 7829.3200, subp 1. The public interest factor entails the kind of legislative policy considerations that underlie the deferential standard we afford to agency decisions. *E.g., Atchison, Topeka & Santa Fe Ry. Co.*, 412 U.S. at 808, 93 S.Ct. 2367; *Reserve Mining Co.*, 256 N.W.2d at 824–25. In its two orders, the Commission provided several reasons for why it concluded CenterPoint had failed to show that granting the variance was in the public interest. The Commission's reasons include: (1) intergeneration-al equity among ratepayers; (2) a determination that CenterPoint may have already been fully compensated in two of its rate-making proceedings that occurred during the years in question; (3) concerns that granting the variance would eliminate the incentive for public utility companies to ensure accurate accounting in the future; and (4) concern that ratepayers should not be held accountable for CenterPoint's "undiscovered and persistent errors."

We conclude that the Commission's decision on the public interest factor was not arbitrary and capricious. First, while in prior cases the Commission had found no negative effect on intergenerational equity, here both the time gap and the amount of the unrecovered costs are significantly different from the prior cases. In *NSP*, the variance request was for approximately $1.05 million and sought losses incurred over a one-year period. *NSP*, at 5. In *Interstate*, the variance request concerned approximately $165,000 in losses incurred over a two-year period. *Interstate*, at 4–5. In contrast, this case involves a five-year look-back period with a much larger recovery amount. This difference in time and costs affects intergenerational equity. Consumers would be paying for significant energy costs that were incurred up to eight years prior to recovery. Greater gaps in time increase the likelihood that the consumers paying for the recovery are not the same customers that originally incurred the costs. As a result, Center-Point's request creates more intergenerational equity problems than the requests at issue in *NSP* and *Interstate*. The Commission has never before approved a variance with the scale of CenterPoint's request,[2] and it was not arbitrary and ca-

---

2. We acknowledge that it appears incongruent to use the scale of CenterPoint's losses to justify the Commission's denial of the public interest factor while at the same time upholding the Commission's conclusion that the losses were not an excessive burden on CenterPoint. But the excessive burden analysis is based on the effect those losses have on CenterPoint and is not just a question of size. As is noted previously, CenterPoint failed to

pricious for the Commission to decline to do so here.

Second, the Commission's determination that granting this variance would undermine the incentive for companies to be accurate in the true-up filing process is also reasonable. The gas utility regulatory system provides for annual true-ups and frequent rate cases to ensure it operates properly. Variances are intended to be a rare exception to that general rule. The Commission appears to be properly concerned that in granting this variance to CenterPoint, the exception would effectively swallow the rule. The Commission's concern about holding ratepayers responsible for CenterPoint's continuing mistakes expresses a similar underlying policy concern. These decisions are the kind of policy determinations the legislature intended the Commission make. It is reasonable for the Commission to strive to maintain an accurate and effective regulatory system, and we conclude it was not arbitrary and capricious for the Commission to conclude that CenterPoint's request threatens that goal.

Finally, CenterPoint objects to the variance denial on the ground that the Commission questioned whether CenterPoint may have been compensated by the two ratemaking proceedings that occurred before CenterPoint discovered the unrecovered costs. CenterPoint's objection is misplaced. First, in the initial order, the Commission merely stated it was concerned about the ratemaking proceedings and that "there has been no showing that the Company has not been fully compensated by ratepayers." Thus, the Commission found only that CenterPoint had failed to prove that the rate cases had not provided some compensation for the unrecov-

ered costs. Moreover, the Commission's concern that the unrecovered costs could affect rate cases does not appear to be arbitrary. In a reply brief submitted to the Commission, CenterPoint attempted to refute concerns about the impact of the rate cases by asserting that the effect of its mistakes would not have increased rates. On the contrary, CenterPoint argued that because it was overestimating sales, if there was an impact, the impact would decrease rates not increase them. Implicit in CenterPoint's argument is the possibility that under-recovery could affect rate setting. Thus, we conclude that it was not arbitrary for the Commission to consider what effect the intervening rate cases might have had on CenterPoint's losses, nor was it arbitrary for the Commission to conclude it had insufficient evidence on whether CenterPoint had in fact been compensated during a ratemaking procedure.

### C. Consistency With State Or Local Law

The third factor in the variance rule requires CenterPoint to prove that granting the variance would not violate local or state law. Minn. R. 7829.3200, subp. 1. It is unclear if the Commission considered the third factor, but we presume that the Commission found CenterPoint to have satisfied this factor.

Ultimately, CenterPoint's variance request had to satisfy all three requirements in the variance rule. The Commission found that CenterPoint failed to meet both the excessive burden and public interest requirements, and as a result the Commission denied CenterPoint's variance request. Without question, the Commis-

---

notice the sums for five years despite monthly and annual accrual, suggesting that it was not arbitrary and capricious for the Commission

to conclude these losses did not pose an excessive burden on the company.

sion's denial of the variance request is different from the result reached in the Commission's two prior decisions. When an agency seeks to deviate from its prior decisions, the agency must provide a reasoned analysis for the change. If a reasoned explanation is provided, we review that explanation to determine whether the explanation was arbitrary and capricious. Here, we conclude that the Commission provided a reasoned order which set forth the facts that the Commission found mandated a different outcome. In reviewing the rationale set out by the Commission, we conclude it was not arbitrary and capricious for the Commission to deny CenterPoint's variance request. Therefore, we reverse the court of appeals and affirm the Commission's order denying the variance request.

Reversed.

## DISSENT

ANDERSON, G. BARRY, Justice (dissenting).

I respectfully dissent, because the Commission has failed to explain why it has departed from prior norms and has not set forth a "reasoned analysis" for the departure and its actions with regard to the matter before us are therefore arbitrary and capricious. *See Sierra Club v. Clark,* 755 F.2d 608, 619 (8th Cir.1985) (citation omitted) (internal quotation marks omitted).

Preliminarily, but fundamentally, it is important to note that the language governing the authority of the Commission to grant a variance is mandatory rather than permissive. The rule at issue provides that the Commission "shall grant a variance" when it determines that "enforcement of the rule would impose an excessive burden on the applicant," and that "granting the variance would not adversely affect the public interest," and that "granting the variance would not conflict with the standards imposed by the law." Minn. R. 7829.3200, subp. 1 (2007). Here, unlike, for example, a zoning variance, Commission discretion is limited by the language of the rule, and if the criteria are met, the variance "shall" be granted. *Cf.* Minn. Stat. § 462.358, subd. 6 (2008) (stating that variances "may only" be granted if criteria are met).

Thus, the first step in order to determine whether it was an arbitrary and capricious action by the Commission to deny relief to CenterPoint, is to consider whether the Commission properly analyzed CenterPoint's claim that it was suffering under an "excessive burden" absent a variance.

When the Commission first considered the excessive burden issue, it used, in its order, the figure of $2.4 million in CenterPoint's calculation errors, an amount almost ten times less than the actual error of $21 million. Not only is the Commission's order wrong as to the amount of the error, the Commission at least partially relied upon the erroneous figure, noting that $2.4 million is approximately 1.6% of CenterPoint's reported net income over that time period. When CenterPoint petitioned for a rehearing, relying in part on this error, the Commission declined to reconsider its decision but instead simply amended the original order to include the correct amount of unrecovered costs.

But this is more than a citation mistake.

The decision to deny CenterPoint's variance request does not square with Commission precedent. As the majority opinion recognizes, the only two reported variance cases based on similar facts reveal a Commission willing to grant variances for unrecovered costs as excessive burdens in the amount of $1 million and $164,781, respectively. *In re Review of the 1994 Automatic Adjustment of*

*Charges for All Gas & Elec. Utils. (NSP)* MPUC Docket No. G, E–999/AA–94–762 (July 13, 1995); *In re Review of the 1997 Annual Automatic Adjustment of Charges for All Gas & Elec. Utils. (Interstate),* MPUC Docket No. G, E–999/AA–97–1212 (May 28, 1998). Here, the unrecovered costs are at least twenty times previous amounts found to qualify for a variance. While the denial of a variance here may be justifiable, the Commission has not fully explained this drastic departure from its previous decisions. The Commission asserted, for example, that it was CenterPoint's error that caused the unrecovered costs and that the error persisted over five years. But industry errors are frequently the cause for seeking variances[1] and the Commission did not sufficiently explain why a five-year delay in seeking a variance is not acceptable. And even if a five-year variance is too long, the Commission did not explain why a variance for a shorter period of time should not be granted.

Nor has the Commission explained why it compared CenterPoint's unrecovered costs to the company's overall gas costs and not, as it had in previous cases, to profitability. A comparison of unrecovered costs to profitability here reveals that CenterPoint's profitability declined, as a result of the unrecovered costs, in a range between .55% and 15.31% in the five years for which it seeks a variance. In contrast, the diminution in *NSP* was 10%. *NSP*, at 7.

The Commission's decision that a variance would be adverse to public interest also appears to be arbitrary and capricious. The Commission claimed to be concerned about intergenerational equity among ratepayers. While this may be a legitimate public interest, the Commission was not particularly concerned with intergenerational equity among ratepayers in previous cases. In *NSP*, the Commission acknowledged the equity issue if it granted the variance, but ultimately granted the variance, concluding that the inequity did not outweigh the benefit of allowing the company to recoup its gas costs. *NSP*, at 7–8. The Commission reached a similar decision in *Interstate. Interstate*, at 5.

Furthermore, while this case could be distinguished from the other two cases because the period in question is five years, rather than one year or two years, the Commission failed to explain why it would be against the public interest to grant a partial variance for some period of time shorter than five years. As the court of appeals noted, the Commission was not faced with an "all-or-none" decision. *In re Review of the 2005 Annual Automatic Adjustment of Charges for All Elec. and Gas Utils.,* 748 N.W.2d 322, 330 (Minn.App. 2008). The Commission must explain why this case is so different from its previous cases and why a complete denial of the variance was more appropriate than a partial variance.

Finally, the Commission stated that it was concerned about the "incentives" that allowing the variance would create for regulated industries. It apparently was concerned that allowing a variance would foster an environment where variances would be sought rather than instituting the required accounting and record-keeping changes necessary to find errors such as occurred here.

---

1. Indeed, NSP also made an error that caused NSP to seek a variance. *NSP*, at 5. The Commission distinguishes the two cases because NSP was attempting to comply with new federal regulations while the CenterPoint error occurred of its own volition. *CenterPoint*, at 3. The relevance of this distinction is not explained by the Commission.

To say that this argument is unpersuasive is too kind; among other things, it presupposes bad faith, or at least sloppiness, on the part of businesses subject to Commission jurisdiction. It assumes that there are no other charges associated with delayed recovery of costs in a variance proceeding, such as legal fees, the lost investment value of those unrecovered costs, or the lost time by employees who must prepare the necessary filings to seek variances from the Commission, all of which could be avoided by installing proper accounting procedures in the first place.

A regulated business subject to Commission jurisdiction is not entitled to a variance simply because there are unrecovered costs. But where, as here, the Commission chooses to deviate from previously established norms in granting such variances, the Commission must set forth "a reasoned analysis for change." *See Sierra Club*, 755 F.2d at 619 (citation omitted) (internal quotation marks omitted). Because the Commission did not do so in denying CenterPoint's request for a variance from the true-up rule, its actions were arbitrary and capricious and I would therefore affirm the court of appeals and remand to the Commission. *See Citizens Advocating Responsible Dev. v. Kandiyohi County Bd. of Comm'rs*, 713 N.W.2d 817, 836–37 (Minn.2006) (finding several of the factors the county relied upon to be arbitrary and capricious, leading to the conclusion that there was insufficient evidence for the agency's decision and that a remand was necessary).

DIETZEN, J. (dissenting).

I join in the dissent of Justice G. Barry Anderson.