*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1006**

In the Matter of Xcel's Request to Issue Renewable
Development Fund Cycle 4 Requests for Proposals and
Petition for Approval of a Standard Grant Contract.

**Filed May 18, 2015
Affirmed
Hudson, Judge**

Minnesota Public Utilities Commission
File No. E-002/M-12-1278

David J. Zoll, Charles N. Nauen, Kristen G. Marttila, Lockridge Grindal Nauen, P.L.L.P., Minneapolis, Minnesota; and

Thomas Melone (pro hac vice), Ecos Energy LLC, Minneapolis, Minnesota (for relator Minnesota Go Solar, LLC)

Michael C. Krikava, Thomas Erik Bailey, Kodi Jean Church, Briggs and Morgan, PA, Minneapolis, Minnesota; and

Mara N. Koeller, Xcel Energy Inc., Minneapolis, Minnesota (for respondent Northern States Power Company, d/b/a Xcel Energy, Inc.)

Lori Swanson, Attorney General, Anjali V. Shankar, Assistant Attorney General, St. Paul, Minnesota (for respondent Minnesota Public Utilities Commission)

Considered and decided by Reyes, Presiding Judge; Hudson, Judge; and

Stoneburner, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**HUDSON**, Judge

In this certiorari appeal, relator challenges respondent public utility commission's denial, based on the recommendations of respondent utility, of relator's application for a renewable-development-fund (RDF) grant. Relator argues that respondent commission (1) failed to follow the statutory funding directives of giving preference to the most cost-effective proposals and strongly considering the benefits to Minnesotans, (2) failed to address record evidence supporting relator's application, and (3) did not accord relator due process. We affirm.

## FACTS

In 1994, to promote renewable energy, the Minnesota legislature established the RDF to administer and distribute funds collected from the ratepayers of respondent Northern States Power Company, d/b/a Xcel Energy. *See* Minn. Stat. § 116C.779 (2014). The legislation requires Xcel to deposit funds into the RDF based on the volume of spent nuclear fuel maintained in Xcel's nuclear-power plants. *Id*., subd. 1. Respondent Minnesota Public Utilities Commission (MPUC) approves grants for RDF funding after recommendations by Xcel, which consults with an advisory board on those recommendations. *See id.*

In 2012, after a legislative audit report recommended changes to the RDF program, the Minnesota legislature amended the program's governing statute. *See* 2012 Minn. laws. ch. 196, § 1, at 276–77; Minn. Stat. § 116C.779. The amended statute provides that "[a] request for proposal [RFP] for renewable energy generation projects

must, when feasible and reasonable, give preference to projects that are most cost-effective for a particular energy source." Minn. Stat. § 116C.779, subd. 1(h). It also provides that, in selecting projects for proposed funding, Xcel "must strongly consider, where reasonable, potential benefit to Minnesota citizens and the utility's ratepayers." *Id.*, subd. 1(f). Xcel must use an independent third-party expert, along with the advisory board, to evaluate proposals submitted in response to an RFP. *Id.* The MPUC may disapprove recommended projects, but it cannot modify those selections without Xcel's agreement. *Id.*, subd. 1(e).

In 2013, in response to Xcel's RFP for the fourth RDF funding cycle, relator Go Solar, LLC, submitted a $7.4-million proposal for 20 one-megawatt solar projects at separate locations on the electrical grid in southeast and southwest Minnesota. The proposed project contemplated a long-term power purchase agreement (PPA) at Xcel's project-avoided cost, with a fixed production incentive from solar renewable-energy credits over a 25-year term. It had stated goals of doubling Xcel's solar generating capacity and creating a template for a solar renewable-energy-credit program.

In the fourth funding cycle, Xcel received 46 proposals for energy-production projects, including Go Solar's project, and 18 proposals for research-and-development (R&D) projects. The independent expert first reviewed and rated the proposals. The independent expert gave Go Solar's proposal the highest total overall score, ranking it highest in terms of total jobs created and highest among energy-production projects for potential benefit to Minnesota and ratepayers, which was weighted 10% for energy-production projects and 40% for R&D projects. Go Solar asserts that it should have also

3

been ranked first in cost-effectiveness because it provided the best value per RDF grant dollar and was priced at avoided costs, which was lower than other solar-energy proposals, which were priced at net-metering, or retail, prices. But the independent expert used a different metric, total resource cost (TRC), and ranked Go Solar's project in the midrange of energy-production proposals for cost effectiveness.

The advisory board then reviewed a list of proposals, considering the independent expert's evaluation as well as qualitative factors, including diversity in location, project types, and technology. Advisory board members noted that the independent expert rated Go Solar's proposal high in every area; that it was a large project; that its "[p]rice was good"; and that its 25-year PPA was longer than typical 15-20 year PPAs. But advisory group members also expressed concerns that the proposed four-month timeline to negotiate PPAs was too short; that Go Solar was capable, but wished to negotiate one PPA for the entire project; that its site locations were open, which added uncertainty; that it was a "[g]ood, but very expensive project" and not suitable for RDF funding; and that the solar renewable-energy-credit proposal was "interesting, but . . . need[ed] more perspective." The advisory group did not recommend Go Solar's proposal to Xcel for funding.

Xcel submitted an initial project selection report and two later supplemental reports to the MPUC, noting its agreement with the advisory group's concerns. Go Solar filed a petition to intervene and requested a contested-case hearing, arguing that significant issues not addressed in the selection process could be resolved only through a contested-case hearing. The Minnesota Department of Commerce and other stakeholders

4

also filed comments. After an audit corrected technical scoring errors, which did not affect Go Solar's proposal, Xcel filed reply comments with a selection-report summary and supplements for the MPUC review. Those comments observed that Go Solar had received the highest technical score of EP proposals, but also that

> [the project w]as disfavored by the advisory group as it would require too large of a portion of the funds anticipated to be awarded to EP projects (over a third of available funds). The energy price per kWh was high relative to other proposals and the locations for constructing the facilities were still open, which adds uncertainty. From prior experience, RDF proposals that do not have specific sites identified or a very clear plan to identify sites have significant project delays. Further, the overall timeline proposed for the project was not long enough based on the Company's prior experiences negotiating power purchase agreements for projects of the scale proposed.

Xcel recommended funding for 13 EP projects, in amounts ranging from $310,310 to $5,000,000. It recommended reserve funding for nine EP projects and no funding for 24 EP projects, including Go Solar's project.

The MPUC issued a decision approving Xcel's recommended projects and some of the reserve projects and denying Go Solar's contested-case-hearing request. The MPUC found that the RFP had notified bidders that selections would be based both on the independent expert's technical score and the advisory group's subjective recommendations, which it deemed a reasonable approach "because it gave Xcel the necessary leeway to select a diverse mix of unique and innovative projects." The MPUC found that the selected projects were likely to further RDF statutory goals by increasing the renewable-energy market penetration at reasonable costs; promoting the startup,

5

expansion, and attraction of renewable companies and projects in Minnesota; stimulating research and development in renewable technology; and developing demonstration-scale and near-commercial renewable electric generation projects. *See* Minn. Stat. § 116C.779, subd. 1(d) (stating those goals). However, based on comments and lessons learned in the RFP and selection process, the MPUC also required Xcel to make a "compliance filing" with proposals for improving transparency in the selection process. Go Solar requested reconsideration, which was denied. This certiorari appeal follows.

## D E C I S I O N

This court may reverse, remand, or modify an administrative agency decision if that decision is, among other deficiencies, affected by legal error, unsupported by substantial evidence in the record as a whole, or arbitrary and capricious. Minn. Stat. § 14.69 (2014). Go Solar argues that the MPUC committed legal error by failing to properly follow the statutory directives for awarding RDF funds under Minn. Stat. § 116C.779, subd. 1(f), (h) (2014), and that the decision not to grant Go Solar RDF funding was arbitrary and capricious and unsupported by substantial evidence.

## I

*Consideration of factors not in statute*

Go Solar argues that in selecting RDF projects based on Xcel's recommendations, Xcel and the MPUC impermissibly considered factors not specifically listed in Minn. Stat. § 116C.779. Generally, an agency's decision is presumed correct, and this court affords deference to an agency in its field of expertise. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn. 1977). But we review matters of statutory interpretation

6

de novo. *In re Application of N. State Power Co. for Approval of its 1998 Res. Plan*, 604 N.W.2d 386, 390 (Minn. App. 2000), *review denied* (Minn. Mar. 28, 2000). Nonetheless, "when a statute is couched in general terms, the agency is left the duty of determining precisely what standards will fulfill the . . . policy enunciated by the legislature." *Id.* (quotation omitted).

If a statute's plain language is clear, this court applies that language. *In re Application of Minn. Power*, 838 N.W.2d 747, 754 (Minn. 2013). We construe the statute as a whole, giving effect to all of its provisions, and consider its words and sentences in light of their context. *Id.*; *see also* Minn. Stat. § 645.16 (2014). We apply canons of construction to discern a statute's meaning only if the statute is ambiguous, which occurs if the text is subject to more than one reasonable interpretation. *Billion v. Comm'r of Revenue*, 827 N.W.2d 773, 777 (Minn. 2013); *Brayton v. Pawlenty*, 781 N.W.2d 357, 363 (Minn. 2010).

By statute, "[an RFP] for renewable energy generation projects must, when feasible and reasonable, give preference to projects that are most cost-effective for a particular energy source." Minn. Stat. § 116C.779, subd. 1(h). And "in evaluating responses to [RFPs], the public utility must strongly consider, where reasonable, potential benefit to Minnesota citizens and businesses and the utility's ratepayers." *Id.*, subd. 1(f). Go Solar argues that under the principle of *expressio unius est exclusio alterius*, the statutory expression of preferences for cost-effective projects and projects providing the most benefits to Minnesotans indicates that the legislature meant to exclude other non-enumerated factors in awarding RFP grants.

The canon of statutory construction, *expressio unius est exclusio alterius*, means that "the expression of one thing is the exclusion of another." *State v. Caldwell*, 803 N.W.2d 373, 383 (Minn. 2011). "*Expressio unius* generally reflects an inference that any omissions in a statute are intentional." *Id*. Go Solar notes this court's decision affirming the exclusion of fair-market value evidence in an eminent-domain damages award, in which we concluded that statutory language stating that the district court "must include" four specific damages factors limited the court's consideration to only those factors. *City of Moorhead v. Red River Valley Coop. Power Ass'n*, 811 N.W.2d 151, 160 (Minn. App. 2012) (quotation omitted), *aff'd*, 830 N.W.2d. 32 (Minn. 2013). But the Minnesota Supreme Court, although affirming our decision, concluded that, because the statute listed "other appropriate factors" as one of the four enumerated factors, it did not support an inference that the district court was to limit consideration of relevant evidence. *City of Moorhead*, 830 N.W.2d at 39 (quotation omitted). Similarly, here, we conclude that the statutory language, "when feasible and reasonable" and "where reasonable" modifies the enumerated preferences and indicates unambiguously that those preferences are not exclusive, so that the doctrine of *expressio unius* does not apply. *See* Minn. Stat. § 116C.779, subd. 1(h), (f); *see also In re PERA Police & Fire Plan Line of Duty Disability Benefits of Brittain*, 724 N.W.2d 512, 516 (Minn. 2006) ("If the statute is not ambiguous, the inquiry ends there.") Therefore, Xcel and the MPUC did not err by considering additional factors in the RDF decision-making process.

*Failure to sufficiently address statutory preferences*

Go Solar argues that, even if the statute permits the MPUC to consider additional factors, its decision was arbitrary and capricious because it failed to "strongly consider" benefits to Minnesotans and "give preference" to the most cost-effective project for a particular energy source. *See* Minn. Stat. § 116C.779, subd. 1(h), (f); *see also In re Petition of S.G.*, 828 N.W.2d 118, 124 (Minn. 2013) (defining to "consider" as "to think carefully and form an opinion about," and "preference," as "[the] select[ion of] . . . someone or something over another or others") (quotation omitted).

An agency decision is arbitrary and capricious "if the agency (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) [made a] decision [that] is so implausible that it could not be explained as a difference in view or the result of the agency's expertise." *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 832 (Minn. 2006). But "[i]f there is room for two opinions on a matter, the [agency] decision is not arbitrary and capricious, even though the court may believe that an erroneous conclusion was reached." *In re Review of 2005 Annual Automatic Adjustment of Charges for All Elec. & Gas Utils.*, 768 N.W.2d 112, 120 (Minn. 2009).

Go Solar first argues that the MPUC's decision is arbitrary and capricious because it failed to refer to the cost-effectiveness preference. *See* Minn. Stat. § 116C.779, subd. 1(h). But the MPUC's failure to articulate that preference in its decision does not mean that the agency did not consider it in the decision-making process. *Cf. Save Mille*

*Lacs Sportfishing, Inc., v. Minn. Dep't of Natural Res.* 859 N.W.2d 845, 851 (Minn. App. 2015) (holding that the absence of a citation to or analysis of a relevant constitutional or common-law principle by an administrative agency in rulemaking does not provide grounds for declaring the rule invalid in a pre-enforcement challenge). As Xcel points out, the RFP required a cost-effectiveness assessment of all projects, which evaluated consideration of cost effectiveness at 30% in scoring EP projects, such as Go Solar's. And Go Solar's assertion that it was ranked first in cost-effectiveness is inaccurate because it used a standard different from that outlined in the RFP and used by the independent expert. In fact, Go Solar was not ranked first in cost-effectiveness and would not have been entitled to a statutory preference based on that criterion.

Go Solar also argues that the RFP decision-making process did not independently address and "strongly consider" whether the selected projects maximized benefits to Minnesotans, Minn. Stat. § 116C.779, subd. 1(f), but instead placed too much weight on "other ad hoc factors," such as a developer's financial and technical credibility and a project's location in a diverse community. Go Solar argues that allowing unquantifiable criteria to trump this stated statutory criterion, which relates mainly to economic benefits, effectively renders the 2012 statutory changes meaningless. But the current statute provides that RDF funds may be used for "any of the following purposes," including the broad purpose of "promot[ing] the start-up, expansion, and attraction of renewable electric energy projects and companies within the state." Minn. Stat. § 116C.779, subd. 1(d)(2). It also provides that the MPUC may disapprove any proposed expenditures that it finds "to [not be] in compliance with [the RDF] statute or otherwise

10

not in the public interest." *Id.*, subd. 1(e). Therefore, read as a whole, the RDF statutory framework affirmatively allows public-interest factors to weigh in the selection process.

Further, we defer to the agency's interpretation of general statutory standards enunciated by the legislature. *Application of N. States Power Co.*, 604 N.W.2d at 390. To that end, the RFP specifies broad criteria for assessing a project's potential benefits to Minnesota and ratepayers, including job creation and fiscal benefits, in addition to addressing barriers to market development, such as issues of utility integration, location constraints, socioeconomic constraints, and the novelty of the proposal. Thus, in selecting projects for RDF funding, Xcel and the MPUC properly considered qualitative factors such as diversity of project type, location, and technology; innovation; benefit to increasing renewable market penetration; cost; practicality; and value to ratepayers in Minnesota and Wisconsin. Consideration of these factors was appropriate and does not render the MPUC's decision arbitrary and capricious.

*Conflicts of interest*

Go Solar maintains that, because individual advisory-group members were allowed to consider recommendations relating to their own projects, the MPUC's decision was arbitrary. Go Solar argues that, although several advisory-group members were recused from assigned review of their sponsored projects, disclosure of conflicts is meaningless if an interested person is not entirely recused from the decision-making process.

We recognize Go Solar's concern. But the structure of the RDF selection process requires Xcel to consult with an advisory group that includes ratepayer representatives

11

and may also include representatives of "other interests." Minn. Stat. § 116C.779, subd. 1(f). To obtain the required expertise for project review, Xcel necessarily recruited advisory-group members with experience in the emerging renewable-energy field. Moreover, the advisory board operated by consensus, which minimized the role of possible conflicts of interest. Further, because Xcel "has . . . sole authority to determine which expenditures shall be submitted . . . for commission approval," *id.*, Xcel was free to reject advisory-board input with which it disagreed. Go Solar points out that Xcel requested a substantial award for its own proposal. But the statute expressly designates Xcel eligible to apply for RDF funding. *Id.*, subd. 1(d). We also note that the MPUC ordered verification of the independent expert's scoring and required Xcel to explain in reply comments why its selections deviated from the independent expert's project rankings. We therefore conclude that advisory-group conflicts of interest did not render the MPUC's decision arbitrary and capricious.

## II

Go Solar argues that the MPUC's decision on funding allocations was unsupported by substantial evidence because it is unreasonable based on the record. An agency decision is supported by substantial evidence if it "is supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion." *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 468 (Minn. 2002). Substantial evidence has been defined as "(1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the

evidence considered in its entirety." *Id.* at 466. The objecting party has the burden to show that the agency's findings are not supported by evidence on the record. *Herbst*, 256 N.W.2d at 825. In assessing whether the substantial-evidence standard has been met, we "determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record." *Application of Minn. Power*, 838 N.W.2d at 757 (quotation omitted).

*Timeline and site selection*

Go Solar argues that the record lacks a basis for Xcel's articulated concerns relating to Go Solar's inability to negotiate a PPA within its four-month stated timeline and to secure site locations. But Xcel's reply comments note the proposal's large scale and Go Solar's prior experience in negotiating PPAs for projects of that scale. The advisory board also indicated that Go Solar wished to negotiate one PPA for the entire 20-site project. And although Go Solar points out that its proposal contained designated site locations, it acknowledges that no specific leases or purchases had been negotiated at those locations. The record thus provides a reasonable basis for rejecting Go Solar's proposal, based on concerns about its ability to execute the project as proposed.

*Cost effectiveness*

Go Solar challenges Xcel's reply comment that Go Solar's "energy price per kWh was high relative to other EP proposals." The independent expert ranked Go Solar's proposal in the mid-range for cost effectiveness, based on a metric of total resource cost, which was calculated using information on initial capital costs, a PPA negotiated with Xcel, and projected energy production. Go Solar argues that the TRC metric did not

13

properly measure its project's cost-effectiveness because electricity from the solar projects could be sold at Xcel's avoided costs. Xcel acknowledges that the TRC metric omits some projected factors; we defer, however, to the independent expert's use of that measurement to evaluate a project's cost-effectiveness. *See Herbst*, 256 N.W.2d at 824 (stating that "deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience"). And we reject Go Solar's argument that the TRC for its project was inaccurate because Go Solar could have entered a PPA at Xcel's avoided cost, rather than at higher preferred rates. The RFP notified Go Solar, like all grant applicants, that its project would be evaluated using a uniform measurement, and the record does not support a reasonable inference that its costs were measured unfairly relative to those of other projects. We also reject Go Solar's contention that Xcel was required to evaluate cost effectiveness in proportion to the amount of grant funds Go Solar requested, rather than the total cost of its project.

*Additional criteria*

Go Solar points out that the independent expert scored its proposal highest in jobs created and local economic impact; it also contends that its proposal lacks many of the negative features of projects selected for funding. But Go Solar's ability to identify some qualities that distinguish its project from approved projects, and some qualities that it shares with approved projects, does not alone determine whether the MPUC's decision is arbitrary and capricious or unsupported by substantial evidence. *See Review of 2005*

14

*Annual Automatic Adjustment of Charges*, 768 N.W.2d at 120 (stating that an agency decision is not arbitrary if room exists "for two opinions on a matter").

Xcel articulated specific reasons for not recommending Go Solar's proposal for funding: its overall project cost, which would require over a third of the funds available for EP projects; its high price relative to other EP proposals; uncertainty about securing site locations; and the overall proposed timeline for negotiating PPAs. The MPUC recognized that Xcel considered a "voluminous selection record" that fully explained its evaluation process, which used technical scores as a baseline and then applied other qualitative criteria. The MPUC found that "[w]here Xcel's recommendations deviated from the Independent Evaluator's rankings, Xcel explained its choices in sufficient detail," and that the approach of selecting projects based on both technical scores and subjective recommendations "was reasonable because it gave Xcel the necessary leeway to select a diverse mix of unique and innovative projects." Xcel and the MPUC fully explained the decision not to recommend or fund Go Solar's project, and based on the record, substantial evidence supports that decision. *See Application of Minn. Power*, 838 N.W.2d at 757 (noting that an agency must "adequately explain[] how it derived its conclusion," which must be "reasonable on the basis of the record" (quotation omitted)).

**III**

Go Solar argues that it should have been afforded a contested-case hearing or similar due process to address material disputed facts. The MPUC must hold a contested-case hearing if a matter "involves contested material facts and there is a right to a hearing under statute or rule, or if the commission finds that all significant issues have not been

15

resolved to its satisfaction." Minn. R. 7829.1000 (2013). A relator who requests a contested-case hearing has the burden to show the existence of material facts that would assist the agency in making its decision. *In re Petition of N. States Power Co.*, 676 N.W.2d 326, 335 (Minn. App. 2004). The MPUC denied Go Solar's request for a contested-case hearing, finding that no disputed material facts warranted a contested case and that further factual development would not assist the agency in making its decision.

No statute entitled Go Solar to a contested-case hearing on its RDF proposal. And absent statutory authority, an agency hearing is "a necessary prerequisite to determining [a party's] legal rights, duties, and privileges only if it is required by the due process provisions of the State and Federal Constitutions." *Indep. Sch. Dist. No. 581 v. Mattheis*, 275 Minn. 383, 386, 147 N.W.2d 374, 376 (1966). Go Solar cannot demonstrate a property interest in obtaining RDF funding and therefore cannot assert a due-process right to a contested-case hearing. *See In re Implementation of Util. Energy Conservation Improvement Programs*, 368 N.W.2d 308, 313 (Minn. App. 1985) (holding that a utility customer had no property right in existing utility rates and thus no right to a contested-case proceeding).

Go Solar argues that it should have been afforded the opportunity to challenge Xcel's recommendation through discovery and cross-examination because the MPUC failed to consider relevant and probative information that could have affected the outcome of the proceeding. In particular, Go Solar challenges the rejection of the independent expert's top ranking of its proposal. But the record shows that Go Solar had sufficient notice of the RDF process and ample opportunity to present evidence

16

supporting its project.[1]  The MPUC reasonably determined that it could address the proposals based on the extensive record, which included numerous comments and Go Solar's objections to the advisory board's and Xcel's recommendations.  The MPUC did not err by declining to order a contested-case hearing.

**Affirmed.**

---

[1] On September 12, 2013, Go Solar filed a petition to intervene, initial comments and request for a contested-case proceeding.  Go Solar filed additional comments on December 12, 2013, and December 31, 2013, respectively.  The matter came before the MPUC on January 23, 2014, and Go Solar made an oral presentation.