*This opinion will be unpublished and*
*may not be cited except as provided by*
*Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A16-0380**

In the Matter of the Wetland Conservation Act appeal
filed by William T. Fisher of a no-loss decision,
located in Section 5, T.119N, R.24W,
Rockford Township, Wright County.

**Filed January 30, 2017**
**Affirmed**
**Smith, Tracy M., Judge**

Minnesota Board of Water and Soil Resources

William T. Fisher, Rockford, Minnesota (pro se relator)

Lori Swanson, Attorney General, Karen Olson, Deputy Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Reyes, Presiding Judge; Johnson, Judge; and Smith, Tracy M., Judge.

**U N P U B L I S H E D   O P I N I O N**

**SMITH, TRACY M.**, Judge

In this certiorari appeal, relator challenges a decision by the Minnesota Board of Water and Soil Resources (BWSR) denying relator's petition to appeal Wright County Soil and Water Conservation District's (SWCD) denial of his application for a no-loss determination under the Minnesota Wetland Conservation Act (WCA).[1] Relator argues

_____

[1] A no-loss application is an opportunity for the applicant to demonstrate that his activities will not result in any permanent loss, or impact, to the wetlands. Minn. R. 8420.0415

that the BWSR erred by (1) determining that his petition to appeal was without sufficient merit and (2) rejecting his procedural challenges. We affirm.

## FACTS

In 2007, relator Fisher T. Williams purchased property that abuts Lake Charlotte in Wright County. That same year, Anderson Engineering of Minnesota, LLC (Anderson) issued a wetland-delineation report, documenting wetland areas in Fisher's property. The SWCD approved the report.

In August 2008, the SWCD completed an inspection and discovered that Fisher had placed 2,352 square feet of unauthorized fill in wetland areas while constructing a driveway. The following month, the SWCD issued a restoration order directing Fisher to remove the 2,352 square feet of unauthorized fill.[2] In response, Fisher offered an alternative restoration plan, agreeing to remove all the fill except for 400 square feet under a de-minimis exemption of the WCA. The SWCD approved Fisher's plan, and by December 2009, the SWCD deemed the restoration order satisfied.

---

(2015). The no-loss applicant is responsible for submitting the proof necessary to show qualification for the claim. Minn. R. 8420.0315 (2015).

[2] WCA prohibits the drainage or filling of wetlands unless they are replaced by wetlands of equal public value, under an approved replacement plan, or mining reclamation plan. Minn. Stat. § 103G.222, subd. 1(a) (2016). The Department of Natural Resources (DNR), with the assistance of local soil and water conservation districts (such as the SWCD), are authorized to issue wetland restoration orders to landowners who have acted in violation of the WCA. Minn. Stat. § 103G.2372, subd. 1 (2016); Minn. R. 8420.0900, subp. 3 (2015). Upon receiving a restoration order, the landowner may restore the impacted wetlands as directed, or instead may submit a replacement plan, exemption, or no-loss application to the local government unit. Minn. R. 8420.0900, subp. 4(A) (2015).

In 2013, Fisher retained Anderson to conduct a second wetland delineation on his property. The updated delineation report showed less wetland in Fisher's property than what was identified in the 2007 report. The SWCD approved the second delineation report.

In January 2014, the U.S. Army Corps of Engineers (Corps) notified Fisher that his 2008 driveway construction impacted 3,456 square feet of wetland. The Corps determined that the wetlands on Fisher's property are "waters of the United States," and therefore subject to section 404 of the Clean Water Act, 33 U.S.C. § 1344 (2012), which prohibits discharges of fill material into the waters of the United States without a permit from the Department of the Army. Instead of pursuing legal action, the Corps offered Fisher an opportunity to apply for an after-the-fact permit to retain the unauthorized fill and mitigate for the wetland loss.

On July 8, 2014, Fisher submitted a Joint Application for Activities Affecting Water Resources with both the Corps and the SWCD, proposing to mitigate for the 3,456 square feet of impact on the wetlands noted by the Corps, and for an additional 3,691 square feet of impact for the construction of a new residence on his property. On August 4, 2014, after a review by the Technical Evaluation Panel (TEP), the SWCD denied Fisher's application, citing two reasons. First, Minn. R. 8420.0520, subp. 3(C)(1) (2015), requires applicants to provide their local government unit with "at least two alternatives that avoid wetland impacts." The TEP concluded that Fisher's application included only one alternative. Second, Minn. R. 8420.0520, subp. 1(E) (2015), requires applicants to replace impacted wetlands by restoring or creating replacement wetland areas having equal or greater public value. The TEP determined that the function and value of the wetlands impacted by

3

Fisher's project is specific for Lake Charlotte, and therefore cannot be adequately replaced off-site per Fisher's proposal.

On June 10, 2015, the DNR issued a cease-and-desist order to Fisher, requiring him to immediately cease unauthorized activities impacting the wetlands on his property. On June 29, 2015, personnel from the SWCD and the BWSR inspected the property, discovering that unauthorized fill had been placed in wetlands and an intermittent stream had been blocked by an earthen dam. On July 16, 2015, the DNR issued a restoration order, requiring Fisher to restore the wetlands by September 15, 2015, or, in the alternative, to submit a wetland replacement plan, exemption, or no-loss application to the SWCD within 40 days.

On August 10, 2015, Fisher filed a no-loss application with the SWCD, stating that the wetlands on his property are "incidental," and therefore not subject to WCA regulation. His application alleged that wetlands were not originally present on his property but were created as a result of residential developments in neighboring lots. On September 8, 2015, the TEP met to discuss Fisher's no-loss application.

After reviewing Fisher's application and the submitted evidence, the TEP found that the evidence did not support Fisher's claim that the wetlands were created incidentally. On September 24, 2015, following the TEP's recommendation, the SWCD denied Fisher's no-loss application, concluding that "[t]he landscape position of the applicant's property relative to Lake Charlotte and the findings of the previous wetland delineations suggest that the wetland has been there historically."

On October 20, 2015, Fisher appealed the SWCD decision to the SWCD Board. On November 9, 2015, the SWCD Board met to discuss Fisher's appeal. After listening to Fisher's argument, the Board voted to affirm the SWCD's determination. The SWCD Board issued its findings on December 14, 2015, concluding that Fisher's position was "without merit," because Fisher had failed to provide adequate evidence that construction activities in neighboring sites vectored additional storm water onto his property, resulting in wetlands where there previously had been none.

On January 11, 2016, Fisher petitioned for appeal to the BWSR. In addition to maintaining his position that the wetlands on his property were created incidentally, Fisher raised several procedural challenges. On February 8, 2016, the BWSR denied Fisher's appeal petition, concluding that his petition was without sufficient merit.

Fisher's certiorari appeal follows.

## D E C I S I O N

A local government unit's decision on a no-loss application may be appealed to the BWSR. Minn. Stat. § 103G.2242, subd. 9(a) (2016); Minn. R. 8420.0905, subp. 3 (2015). Within thirty days after receiving a petition to appeal, the BWSR must decide whether to grant the petition and hear the appeal, or to deny the petition. Minn. Stat. § 103G.2242, subd. 9(b) (2016). The BWSR must grant the petition to appeal unless it finds that "the appeal is without significant merit, trivial, or brought solely for the purposes of delay." *Id.*, subd. 9(b)(1).

If the BWSR denies the petition to appeal, the denial is considered an agency decision in a contested case, and the aggrieved party is entitled to judicial review of the

5

decision. Minn. Stat. §§ 14.63-.69 (2016); § 103G.2242, subd. 9(d) (2016). We review such a decision to determine whether it is: (1) in violation of constitutional provisions; (2) in excess of the agency's jurisdiction or statutory authority; (3) the result of unlawful procedure; (4) affected by an error of law; (5) unsupported by substantial evidence; or (6) arbitrary or capricious. *In re Review of 2005 Annual Automatic Adjustment*, 768 N.W.2d 112, 118 (Minn. 2009). An agency's decision enjoys a presumption of correctness; the appellate court defers to the agency's expertise and special knowledge in its field. *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance for the Discharge of Treated Wastewater*, 731 N.W.2d 502, 514 (Minn. 2007).

## I. The BWSR's decision is not arbitrary or capricious.

Fisher argues that the BWSR erred in denying his appeal petition for lacking sufficient merit. In his appeal to this court, Fisher does not specify the statutory ground on which this court should reverse the BWSR's denial of his petition. But his informal brief suggests an assertion that the BWSR's decision was arbitrary and capricious. We disagree.

> [A]n agency ruling is arbitrary and capricious if the agency (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.

*Citizens Advocating Responsible Dev. v. Kandiyohi Cty. Bd. of Comm'rs*, 713 N.W.2d 817, 832 (Minn. 2006). An agency decision is arbitrary or capricious if the decision is based on whim or is devoid of articulated reasons. *CUP Foods, Inc. v. City of Minneapolis*, 633 N.W.2d 557, 565 (Minn. App. 2001), *review denied* (Minn. Nov. 13, 2001).

6

Fisher's no-loss application is based on his claim that the wetlands on his property are incidental. Incidental wetlands are wetland areas that the landowner can demonstrate, to the satisfaction of the local government unit, were created in nonwetland areas solely by actions not intended to create the wetlands. Minn. R. 8420.0105, subp. 2(D) (2015). Incidental wetlands may include drainage ditches, impoundments, containment of waste material, and storm-water retention or detention. *Id.* A replacement plan for wetlands is not required for activities impacting incidental wetlands. Minn. Stat. § 103G.2241, subd. 5 (2016).

Specifically, Fisher argues that the wetlands on his property were not originally present but were created when some residential developments in neighboring lots diverted the flow of storm-water runoff from its usual eastern and northeastern path, onto Fisher's lot in the west. In support, Fisher submitted National Wetland Inventory (NWI) maps from the U.S. Fish and Wildlife Service, dated from August 2015, and five aerial photographs overlooking his property and the surrounding areas.

While conceding that the NWI maps do not show wetlands on Fisher's property, the TEP and the SWCD Board both stated that the NWI maps do not always provide an accurate representation of wetland locations. During the November 2015 hearing where Fisher argued his application in front of the SWCD Board, the district manager for the SWCD mentioned that wetlands, especially small ones, often do not appear on the NWI maps. Subsequently, the SWCD Board noted in its findings that "[t]he NWI map has been known to identify wetlands where none in fact exist and has also, as in the case with Mr. Fisher, fail[ed] to identify areas where wetland[s] do exist."

7

As for Fisher's aerial photographs, the TEP concluded that "[t]he review of historic aerial photos shows the development of the surrounding area over time, but is inconclusive regarding the way in which the watershed has been modified and how that relates to the wetlands on [Fisher]'s property being incidental." During the November 2015 hearing, the SWCD Board members noted that the photographs were undated[3] and "pretty grainy to see anything."

Accordingly, the TEP and the SWCD Board both agreed that Fisher had failed to present sufficient evidence to support his claim that the wetlands on his property are the result of man-made activities and therefore incidental. On the contrary, the TEP and the SWCD Board viewed the available evidence as favoring the opposite conclusion. According to the TEP, the landscape position of Fisher's property relative to Lake Charlotte, and the findings of the 2007 and 2013 wetland-delineation reports, which identified wetland areas on Fisher's property, suggest that the wetlands in question have been historically present. Additionally, during the November 2015 hearing, a SWCD member noted that Lake Charlotte rises into Fisher's property at times of elevated water levels, suggesting that the wetlands were created from this natural occurrence, and not from man-made construction activities.

Upon review, the BWSR affirmed the determinations made by the TEP and the SWCD Board and denied Fisher's petition for appeal as being without sufficient merit. While recognizing that the NWI maps provide "valuable information on the general

---

[3] Fisher clarified during the hearing that at least one photograph was taken in the 1950s.

location of wetlands," the BWSR explained that the maps alone are insufficient to accurately define wetland boundaries and should be referenced in conjunction with on-site determinations such as the two previous wetland-delineation reports. As for the aerial photographs, the BWSR noted that they showed the property obscured by medium-to-heavy tree cover, and therefore could not prove how the path of the storm-water runoff changed over the years and created incidental wetlands on Fisher's property. In all, emphasizing that it was Fisher's duty to prove the claims made in his no-loss application pursuant to Minn. R. 8420.0105, subp. 2(D), and 8420.0315, the BWSR concluded that Fisher did not provide sufficient evidence to support his assertion that wetlands did not originally exist on his property, and that man-made activities, such as storm-water alterations, were the sole source of their creation onsite. The BWSR did not offer an opinion on whether the wetlands on Fisher's property actually were historically present.

Fisher argues that WCA regulations require the BWSR to utilize the NWI maps, which do not show wetlands on his property. WCA rules incorporate by reference the NWI maps; the rules do not establish the maps as the sole authority on wetland locations. Minn. R. 8420.0112 (2015). And while it is true that the NWI maps do not show wetlands on Fisher's property, the maps include a clear disclaimer that they are for "general reference only," and that "the US Fish and Wildlife Service is not responsible for the accuracy or currentness of the base data shown on [the maps]." In any event, the BWSR did utilize the NWI maps but found them less persuasive compared to the 2008 and 2013 wetland-delineation reports that clearly outlined wetland boundaries on Fisher's property after onsite inspections. It should also be noted that, at the time the second delineation was

9

completed, Fisher submitted the report to the SWCD for approval (which he received), without raising any issues concerning the accuracy of the delineation or whether the wetlands should be classified as incidental.

As for Fisher's argument that the wetlands on his property were created as a result of past construction activities in neighboring lots diverting storm water into his lot, it is unclear how the aerial photographs demonstrate this theory. The five photographs he submitted as evidence are mostly undated and show trees obscuring the property. They do not depict any storm-water paths, or how the paths changed over the years.[4]

Because the record supports the BWSR's finding that Fisher failed to provide adequate evidence to demonstrate his position that the wetlands on his property are incidental, we conclude that the BWSR did not act arbitrarily and capriciously in denying Fisher's petition to appeal on the basis that it is without sufficient merit.

## II. Fisher's procedural challenges do not warrant reversal of the BWSR's decision.

This court may reverse or modify an agency decision if the substantial rights of the petitioner may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are made upon unlawful procedure. Minn. Stat. § 14.69 (2016).

In his appeal petition to the BWSR, Fisher raised several procedural challenges against the TEP and the SWCD's decisions. Fisher argued that (1) the TEP's

---

[4] Fisher also submitted watershed maps as part of his appeal petition to the BWSR. The BWSR does not discuss the maps in its findings. Fisher claims that the watershed maps show how the storm-water runoff suddenly changed its usual route and began flowing through his lot. He does not explain where the maps indicate this change.

recommendation, and the resulting SWCD denial of Fisher's no-loss application, is invalid because the DNR did not participate in the TEP meeting; (2) the TEP did not produce any findings of fact; and (3) the SWCD Board did not have all the relevant information at the November 2015 hearing. In its order denying Fisher's appeal petition, the BWSR rejected all of Fisher's procedural arguments. On appeal to this court, Fisher contends that the BWSR erred in rejecting his procedural challenges, and raises additional challenges by asserting that (4) the SWCD failed to make a decision on his no-loss application within 60 days as required by statute, and (5) the SWCD cannot act as the local government unit under the WCA. We discuss each in turn.

**(1)     TEP membership**

Under Minn. Stat. § 103G.2242, subd. 2(a) (2016), the TEP "shall provide the wetland determination and recommendations on other technical matters to the local government unit that must approve . . . a no-loss determination." The statute also provides:

> The Technical Evaluation Panel shall be composed of a technical professional employee of the board, a technical professional employee of the local soil and water conservation district or districts, a technical professional with expertise in water resources management appointed by the local government unit, and a technical professional employee of the Department of Natural Resources for projects affecting public waters or wetlands adjacent to public waters.

*Id.* Minn. R. 8420.0240 adopts the same membership requirement.

In the present case, the TEP met on September 8, 2015 to discuss Fisher's no-loss application. The findings report from that meeting lists two members from the SWCD,

11

and one member from the BWSR, as TEP attendees. No one from the DNR is shown as an attendee.

Fisher argues to this court that the DNR was a statutorily required member of the TEP in this case. Under Minn. Stat. § 103G.2242, subd. 2(a), DNR presence is required for projects affecting public waters, or wetlands adjacent to public waters. The record does not indicate whether Lake Charlotte meets the statutory definition of "public waters." *See* Minn. Stat. § 103G.005, subd. 15 (2016). But assuming Lake Charlotte is public waters, this would mean the BWSR did err when it concluded that the TEP membership composition met the statutory requirement despite the absence of the DNR. It is, however, unlikely that this defect could have prejudiced Fisher's substantial rights to the extent warranting a modification or reversal of the BWSR's decision under Minn. Stat. § 14.69. *See E.N. v. Special School Dist. No. 1*, 603 N.W.2d 344, 349-50 (Minn. App. 1999) ("Section 14.69 . . . provides this court the authority to reverse or modify a decision only when 'substantial rights' of a petitioner have been prejudiced by a violation of procedure."). The BWSR's conclusion that Fisher provided insufficient evidence to support his no-loss claim was not solely based on the TEP's recommendation. The BWSR denial order indicates that it reviewed the SWCD Board's discussion of Fisher's application, and independently evaluated the relevance of Fisher's submitted evidence, before arriving at the decision that Fisher's petition was without merit. Accordingly, we conclude that the BWSR's decision should not be invalidated based on its error regarding TEP membership.

**(2)    TEP's findings of fact**

Next, Fisher contends that the BWSR erred in concluding that the TEP produced adequate findings after its meeting. The record, however, contains written findings from the TEP. The findings explain why the TEP considered Fisher's evidence as insufficient and, accordingly, recommended denial of Fisher's application. Therefore, we conclude that the BWSR did not err on this issue.

**(3)    The SWCD Board's November 2015 hearing**

Next, Fisher argues that the BWSR erred in concluding that the SWCD Board reviewed all the pertinent evidence at the November 2015 hearing before rendering a decision on his application. A review of the hearing transcript, however, indicates that the SWCD Board members had the NWI maps and the aerial photographs in front of them and referenced these documents throughout the discussion. Accordingly, we conclude that the BWSR did not err on this issue.

**(4)    Timing of SWCD's decision on Fisher's no-loss application**

On appeal to this court, Fisher argues for the first time that the SWCD failed to make a decision on his no-loss application within 60 days as required by Minn. Stat. § 15.99 (2016), resulting in an automatic approval of his application. This court generally will not consider matters not argued to and considered by the agency below. *See Big Lake Ass'n v. St. Louis Cty. Planning Comm'n*, 761 N.W.2d 487, 491 (Minn. 2009) (refusing to consider an issue on certiorari review that was not properly raised before a local zoning authority). Because Fisher never raised the argument regarding the timing of the SWCD's

13

decision before the SWCD Board or the BWSR, and they had no opportunity to address it, we decline to consider this issue on appeal.

**(5)  The SWCD as the local government unit**

On appeal to this court, Fisher argues for the first time that the SWCD cannot serve as the local government unit on this matter.  This court generally will not consider matters not argued to and considered by the agency below.  *See id*.  Because Fisher never raised the argument regarding the SWCD's ability to serve as the local government unit before the SWCD Board or the BWSR, and they had no opportunity to address it, we decline to consider this issue on appeal.

**III.  The BWSR is not required to reimburse Fisher.**

Fisher argues to this court that the BWSR should reimburse him for costs that he incurred in pursuing his no-loss application, totaling $15,872.67.  Fisher cites to no legal authority to support his reimbursement claim.  Beyond mentioning "the amount of time and effort" that he spent toward resolving this matter, he does not explain why he is entitled to reimbursement.  This court therefore declines to address this issue.  *See State Dep't of Labor & Indus. v. Wintz Parcel Drivers, Inc.*, 558 N.W.2d 480, 480 (Minn. 1997) (declining to address issue in absence of adequate briefing).

**Affirmed.**